JOHN D. PARK AND SONS COMPANY, Appellant, *v.* THE NATIONAL WHOLESALE DRUGGISTS' ASSOCIATION et al., Respondents.

1. PLEADING — DEMURRER — CONCLUSIONS OF LAW. Allegations that .he defendants are contriving and conspiring to obtain exclusive control of the wholesale and jobbing trade in patent medicines, to control the prices at which, and the terms upon which, such goods shall be sold, and to destroy and prevent competition between wholesale and jobbing drug gists, are conclusions of law not admitted by demurrer.

2. MONOPOLY — UNIFORM PRICE — PROPRIETARY GOODS. An agreement between the manufacturers of proprietary medicines and an association of wholesale dealers in such articles to sell their goods at a uniform jobbing price for fixed quantities to such dealers only as would conform to the manufacturers' price list in making sales of goods, does not establish a monopoly on the part of the members of the association, where all wholesale dealers have the right to purchase goods from the manufacturers upon the same terms as the members of the association, upon undertaking to maintain the prices established by the manufacturers.

3. CONTRACT — RESTRAINT OF TRADE — PUBLIC POLICY. A contract between the manufacturers of patent medicines and an association of wholesale dealers in such articles establishing a uniform jobbing price for fixed quantities to dealers who agreed to maintain the prices established by the manufacturers is not unlawful as in restraint of trade or against public policy, although it does away with the competition among dealers as to prices, where it places no restriction upon them as to the quantities that they may be able to sell or the territory within which they may transact business.

1

4. PLEADING — THREATS — INTIMIDATION.  Averments in a suit for injunctive relief that manufacturers of proprietary goods were prevented from making sales to the plaintiff because they wished to protect themselves with the wholesale druggists who had adopted the contract or rebate plan and agreed to maintain the manufacturers' prices, do not allege a threat, since the manufacturers might be influenced by what they deemed their best interest; nor do allegations that the wholesale druggists recommended untiring opposition against the sale of articles of manufacturers who did not accept the contract plan aver intimidation where their failure to adopt the plan simply left their goods upon the unrestricted list which druggists could contract for and sell in such manner as they saw fit.

5. BOYCOTT — PROPRIETARY GOODS — REFUSAL TO SELL.  That manufacturers of proprietary medicines refused to sell their goods to a wholesale dealer except at the retail price, or to allow commissions or a rebate upon the goods purchased, does not constitute a boycott where the refusal is based upon the dealer's unwillingness to maintain the selling prices fixed by the manufacturers.

6. INJUNCTION — SURVEILLANCE.  That the members of a wholesale druggists' association caused the business place of a wholesale dealer to be watched to determine who the druggists were who furnished such dealer with proprietary goods in violation of their contract with the manufacturers, does not call for the intervention of a court of equity.

7. UNIFORM PRICE — PROPRIETARY GOODS.  Wholesale dealers are at liberty to persuade manufacturers to establish a uniform price for fixed quantities of their goods, thus enabling small concerns to purchase as cheaply as large ones and compete with them in the retail trade, and a court of equity will not restrain the small dealers from exercising this privilege.

8. CONTRACT — VALIDITY — UNIFORM PRICE.  The proprietor of patent medicines has the right to fix the price at which his article shall go to the consumer, and a druggist who takes his articles for sale under an agreement that he will maintain the price, is liable to respond in damages if he violates the contract.

9. BLACKLISTING — PROPRIETARY GOODS — CUTTING PRICES.  Wholesale dealers who have agreed with the manufacturers of proprietary medicines to handle their goods at a uniform price fixed by the latter, which price the dealers agree to maintain, have the right to inform the manufacturers of dealers who are cutting the established price, and such conduct is not unlawful as blacklisting.

*Park & Sons Co.* v. *Nat. Druggists' Assn.*, 54 App. Div. 223, affirmed

(Argued November 13, 1902; decided April 28, 1903.)

APPEAL from a judgment entered November 27, 1900, upon an order of the Appellate Division of the Supreme Court in

the first judicial department, which affirmed a judgment of Special Term sustaining demurrers to the complaint.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Henry T. Fay* for appellant. Plaintiff's action is to enjoin the continuance of a conspiracy on the part of certain wholesale druggists, its competitors, defendants herein and others, to injure, ruin and destroy its business, and specifically to enjoin the continuance of various acts being done in furtherance of that conspiracy. (*People* v. *Mather*, 4 Wend. 229.) The right of a person to do or not to do a certain act is no warrant in law for a conspiracy of others, sought to be accomplished by compelling him to do so. (*People* v. *Fisher*, 14 Wend. 9; *S. S. Co.* v. *McKenna*, 30 Fed. Rep. 48; *Casey* v. *T. Union*, 45 Fed. Rep. 135; *Curran* v. *Galen*, 152 N. Y. 33.) The fact that the articles in question are not necessities of life does not affect the plaintiff's rights. (*Judd* v. *Harrington*, 19 N. Y. Supp. 406; *People* v. *Duke*, 19 Misc. Rep. 292; *Curran* v. *Galen*, 152 N. Y. 33; *Templeton* v. *Russell*, L. R. [1 Q. B. 1893] 715.) The acts of the defendants which the plaintiff asks to have enjoined are unlawful because they are being done in furtherance of unlawful combinations and conspiracies. (*Stanton* v. *Allen*, 5 Den. 434; *Hooker* v. *Vandewater*, 4 Den. 349; *Clancey* v. *Salt Co.*, 62 Barb. 395; *Livermore* v. *Bushnell*, 5 Hun, 585; *People* v. *N. R. S. R. Co.*, 16 Civ. Pro. Rep. 1; 54 Hun, 354; *People* v. *Sheldon*, 66 Hun, 590; *People* v. *Sheldon*, 139 N. Y. 251; *Judd* v. *Harrington*, 139 N. Y. 105; *People* v. *Milk Exchange*, 145 N. Y. 267; *Addyston* v. *United States*, 175 U. S. 211.) Defendants are engaged in and parties to an unlawful conspiracy to prevent plaintiff from doing any business as a wholesaler and jobber of patent medicines or proprietary goods, and to injure, ruin and destroy its business by force, threats, intimidation, and by interfering and threatening to interfere with the property of the plaintiff and with its use and employment thereof. (*Curran* v. *Galen*, 152 N. Y. 33;

*N. P. Assn.* v. *Cumming*, 170 N. Y. 315; *People* v. *Kortka*, 4 N. Y. Cr. Rep. 429; *People* v. *Wilzig*, 4 N. Y. Cr. Rep. 403; *U. S.* v. *Kane*, 23 Fed. Rep. 748; *Matthews* v. *Shankland*, 25 Misc. Rep. 604; *Davis* v. *Zimmerman*, 91 Hun, 489; *Machall* v. *Ratchford*, 82 Fed. Rep. 41; *G. Co.* v. *G. B. Assn.*, 46 Atl. Rep. 208; *C. S. & W. Co.* v. *Murray*, 80 Fed. Rep. 811.) The plaintiff has been, and is being, injured in its business and property as a result of such unlawful acts of the defendants. (*Thomas* v. *M. Union*, 121 N. Y. 45.) Plaintiff is entitled to a judgment restraining the further continuance of each of the illegal acts complained of. (*Thomas* v. *M. Union*, 121 N. Y. 45; *Tanenbaum* v. *Exchange*, 33 Misc. Rep. 134; *Davis* v. *Zimmerman*, 91 Hun, 489; *Curran* v. *Galen*, 152 N. Y. 33; *Matthews* v. *Shankland*, 25 Misc. Rep. 604; *Matter of Debbs*, 158 U. S. 564; *Casey* v. *C., etc., Union*, 45 Fed. Rep. 135; *Arthur* v. *Oaks*, 63 Fed. Rep. 310; *C. S., etc., Co.* v. *Murray*, 87 Fed. Rep. 811; *Cœur D'Alene* v. *Miners' Union*, 51 Fed. Rep. 260; *Barr* v. *Essex Trades Council*, 53 N. J. Eq. 101.)

*Henry Galbraith Ward* and *Leo Everett* for respondents. The complaint does not show a combination or conspiracy to injure the plaintiff. The validity of a contract between the manufacturer and the purchaser of an article that the latter shall not sell below a stipulated price is well established. (*Garst* v. *Harris*, 177 Mass. 72; *Fowle* v. *Park*, 131 U. S. 88; *Walsh* v. *Dwight*, 40 App. Div. 513; *Lough* v. *Outerbridge*, 143 N. Y. 271; *C. Ins. Co.* v. *Fire Underwriters*, 67 Fed. Rep. 310; *Anderson* v. *U. S.*, 171 U. S. 604; *Curran* v. *Galen*, 152 N. Y. 33; *People* v. *Sheldon*, 139 N. Y. 251; *Matter of Davies*, 168 N. Y. 89; *Hooker* v. *Vandewater*, 4 Den. 349.) The plaintiff has no standing to obtain an injunction against the defendants. (*Atty.-Gen.* v. *U. Ins. Co.*, 2 Johns. Ch. 371; *Thomas* v. *M. Union*, 121 N. Y. 45; *Matter of Davies*, 168 N. Y. 189; *M. S. S. Co.* v. *McGregor*, L. R. [App. Cas. 1892] 25: *B. Mfg. Co.* v. *H. Co.*, 54 Minn. 223.)

HAIGHT, J.   The question presented for review is as to whether the complaint states facts sufficient to constitute a cause of action.

The relief sought by the plaintiff is an adjudication that the resolutions, agreements, plans and modes for the conducting of the business of the sale of proprietary medicines by the National Wholesale Druggists Association are illegal and that an injunction issue restraining the members of the association from continuing to make efforts to induce any manufacturer or proprietor of what is known as patent or proprietary medicines from adopting the rebate or contract plan for the sale of their goods or of continuing such plan if they have previously adopted the same.

The complaint is very voluminous and I have not attempted to give even a fair synopsis, for that would necessarily cover many pages, and I have not deemed it necessary, for it appears to me that the rights of the parties must depend upon a few controlling facts which may be briefly stated.

It appears from the allegations of the complaint that the matter in controversy has reference to the sale by manufacturers of those particular medicines or remedies covered by trade marks, copyrights or patents which secure to the manufacturer or proprietor the exclusive right to manufacture and sell the same.   These medicines are known as "proprietary goods" and their manufacture and sale are confessedly under the control and management of the owner or manufacturer, who may fix his own price and adopt such plan for the sale thereof as he, in his judgment, may determine.   At one time the sale of these goods was largely made through traveling sales agents who worked upon commissions and supplied the goods to the consumer or retailer.   Later on they were sold largely through the druggists, but many of the manufacturers did not maintain a uniform price.   They would supply goods to some of the wholesalers upon more favorable terms than to others, thus permitting large dealers to make a profit while a great number of the smaller druggists found the handling of proprietary goods unprofitable.   This resulted in the organi-

zation of the National Wholesale Druggists Association, an unincorporated body, which, in 1882 and 1883, represented ninety per cent of the wholesale jobbing trade of the United States.   At a meeting of this association a plan was devised and adopted for the conduct of the business of the sale of proprietary goods, which was in the form of a petition addressed to the proprietors asking them to fix a uniform jobbing price for fixed quantities, and also a selling price by the druggists which they were to agree to maintain and that the druggists should be allowed the difference between the jobbing and the selling price as their profit or rebate which they asked should be not less than ten per cent, the proprietors defraying the expenses of boxing and freight to the nearest transportation station of the buyer.   It is alleged that a large number of the proprietors consented to this arrangement and adopted the plan suggested by the wholesale druggists. And this mode of conducting the business appears to have been continued until the December meeting of the association in 1893, at which time a committee, to whom the Detroit plan, so called, had been referred, reported, among other things, the following : " That in order to strengthen and render this plan more effective it is respectfully recommended that proprietors accept orders for full quantities with rebate, discounted only from regular houses recognized as belonging to the number who will faithfully observe the prices and conditions established by the manufacturers." This appears to have been adopted and was acquiesced in by the manufacturers and became the plan under which the business was conducted at the time this action was commenced.

It further appears from the allegations of the complaint that the plaintiff never acquiesced in this plan of conducting the business, but always insisted on its right to sell proprietary goods at such price or prices as it saw fit, in its discretion, and would not be bound by the price established by the manufacturers ; that thereupon the manufacturers refused to sell or ship goods to the plaintiff, and it was compelled to procure goods from other druggists ; that the National Wholesale

Druggists Association caused the plaintiff's premises to be watched by spies or detectives, and that they made reports to the manufacturers of the druggists who purchased goods of the proprietors and caused them to be delivered at the plaintiff's premises, and that the association also furnished the manufacturers with a list of all of the druggists throughout the United States who were willing to be controlled by the contract plan. The complaint then alleges that the defendants " were combining and conspiring to obtain an exclusive control of the wholesale and jobbing trade, as between the manufacturer and the retailer, in all classes of patent medicines or proprietary goods ; and to regulate and control the methods upon which the said trade shall be carried on throughout the entire United States, and to control the prices at which, and the discounts, allowances for freight and the terms of credit upon which the said proprietary goods shall be sold to the various retail druggists throughout the United States ; and to destroy and prevent any and all competition between the said wholesale and jobbing druggists in the wholesale and jobbing trade in said proprietary goods, and limit and restrict the business of each of the wholesale and jobbing druggists, or such of them as are in one locality, to certain exclusive territory tributary, or proximate, to each of them respectively."

The demurrer is an admission of the facts alleged, but not of the conclusions of law. The allegations just above quoted, I understand to be conclusions of law drawn from the allegations of fact alleged in the complaint, and are not, therefore, admitted by the demurrer. It, therefore, becomes necessary to determine whether the plan for the conducting of the business of the sale of proprietary goods, adopted by the association and which it requested the proprietors or manufacturers to adopt and carry out, is lawful. The question thus presented is of considerable importance. The plan, as we have seen, in its substantial features, has been in operation nearly twenty years and in its final completed form nearly ten years. This plan, as I understand, is not one confined to the sale of proprietary medicines, but is one that has been

adopted by many manufacturers of merchandise and other goods where manufacturers have established a trade mark and have gained a reputation which they wish to maintain throughout the country for character, quality and durability of the goods which they manufacture. They have, consequently, established prices at which their goods shall be sold to the consumer and require all wholesale and retail dealers to supply the consumer at the price list established. The decision, therefore, reached herein may largely affect the plan of conducting business in other articles of commerce.

It is said that the National Wholesale Druggists Association was organized and continued for the purpose of monopolizing and controlling the business of the wholesale druggists and jobbers in the sale of proprietary or patent medicines in the United States. The association, doubtless, was organized and continued for the purpose of devising and procuring to be carried into effect a plan for the sale of such goods throughout the United States, which would do away with the necessity of maintaining traveling sales agents and which would secure to the dealers a uniform commission for the handling of the goods, but I do not understand that this was the establishing of a monopoly on the part of the members of the association; for, under the plan adopted, every dealer has the right to purchase goods from the manufacturers upon the same terms as the members of the association, with the right to the same rebate or commissions upon complying with the requirements of the manufacturers with reference to following their price list in making sales of goods. The members of the association clearly had the right to work for their own interests; they had the right to devise and adopt a plan for the conduct of the business in which they could make a commission or a profit, so long as they did not unlawfully interfere with the rights of others. They had the right to petition the manufacturers to adopt the plan devised by them and to support their petition with all of the arguments and persuasions that they could bring to bear, so long as they did not resort to threats or intimidation. The proprietors, having the

exclusive right to manufacture and sell their goods, had the right to adopt such plan with reference to the disposal thereof as they saw fit, and if they became convinced that the contract or rebate plan, so called, was more advantageous to them and more fair and just to the public, by establishing a uniform price in all sections of the country, they had the right to adopt the same and no one could complain.

Nor does the plan appear to me to be in restraint of trade. It is true that it does away with the competition among dealers as to prices, but it creates no restriction upon them as to the quantities that they may be able to sell or the territory within which they may confine their transactions ; but upon the question of prices we must bear in mind that the goods are covered by patent rights and trade marks, which give the proprietors the exclusive right of specifying prices at which the articles shall be sold, and following this, the right also to require dealers to maintain the prices specified. The plan does not operate to restrict sales in any localities, but contemplates a ready method of distributing the goods throughout the entire country. It is, in effect, the creating of an agency on the part of the proprietors, by which every druggist throughout the United States may receive the goods and dispose of them as agents of the principal, receiving the commissions agreed upon therefor.

Is this plan against public policy ? An active competition and rivalry in business is, undoubtedly, conducive to the public welfare, but we must not shut our eyes to the fact that competition may be carried to such an extent as to accomplish the financial ruin of those engaged therein and thus result in a derangement of the business, an inconvenience to consumers, and in public harm. While public policy demands a healthy competition it abhors favoritism, secret rebates and unfair dealing and commends the conduct of business in such a way as to serve all consumers alike. That this is the tendency of modern times is evident from the recent discussions and legislation upon the subject of interstate commerce. One of the cardinal and chief principles of the plan adopted is the

establishing of a uniform price by proprietors which necessitates the service of all persons alike throughout the United States, the proprietors subjecting themselves to the extra expense for ·freight, etc., in remote sections of the country. I can discover nothing in this which is detrimental to the public policy of the country. The right would certainly not be denied to the manufacturer of a given remedy to adopt the rule that he would only sell it˙ to the jobbers of the country at a certain long price and would not allow a discount of ten per cent where they refused to maintain his price. In other words, the manufacturer says to the jobbers of the country, I manufacture a medicine that I will sell for one dollar a bottle, and it is my desire that it shall be sold at that price per bottle throughout the country. If you will take consignments of this medicine from me, billed to you, at that price per bottle, I will allow you a rebate of ten per cent, and if I find that you are selling at a lower price than billed to you, I will allow no rebate. If this arrangement is not satisfactory to you, I prefer to keep my manufactured stock on hand. These are the only conditions under which I will ship my manufactured article.

Surely, there is nothing in this approaching restraint of trade or the violation of the principle of public policy. It is simply allowing a man to do what he will with his own.

I do not understand that the complaint charges that the manufacturers were compelled to adopt the plan by reason of threats or intimidation on the part of the members of the association. It is true that the complaint contains the allegation repeated a number of times, to the effect that the proprietors or manufacturers were prevented from selling the plaintiff proprietary goods, for the reason that they wished to protect themselves " with the wholesale and jobbing druggists." And, also, that at one of the meetings of the association the committee on proprietary goods reported that with a few exceptions the proprietors of all the prominent proprietary medicines had adopted the contract or rebate plan for the sale of their goods, and then concluded its report with the

recommendation " that continued and untiring opposition be shown to the sale of the articles of those proprietors who do not adopt said contract or rebate plan for the sale of their goods, or who withdraw from the plan." There is no allegation, however, that this resolution was served upon the proprietors or was otherwise presented to them. The first allegation alluded to does not, as I understand it, amount to a threat when taken in connection with the other allegations of the complaint with reference to the plan devised for the conduct of the business. The proprietors might well deem it to be for their best interests to act in accord with the wishes of the druggists rather than those of the plaintiff. As to the second allegation, untiring opposition was to be continued against the sale of articles of proprietors who did not accept the contract plan, or, in other words, to the sale of proprietary goods under the old system. I do not understand that by this allegation it was intended to charge that the plan adopted prohibited druggists from dealing with proprietors or manufacturers who did not adopt the contract plan with reference to the sale of proprietary goods, for, under other allegations of the complaint, it appears that the failure of a manufacturer to adopt the plan simply left his goods upon the unrestricted list, for which druggists could contract in such manner as they saw fit. This is apparent from the resolution adopted by the association at its Washington meeting in 1890.

Is there any boycott of the plaintiff ? It is true many of the proprietors refused to sell to the plaintiff proprietary goods except at the long price, which I understand to be the selling price. They have refused to allow it commissions or a rebate upon the goods purchased, but this refusal is based upon the ground that the plaintiff refused to sell at the prices fixed by the proprietors. The plaintiff can, at any time, avail itself of the right to purchase upon the contract plan by complying with the requirements of the proprietors. The reply made by one of the proprietors to a letter of John D. Park & Sons under date of January 25, 1889, annexed to and made a part of the complaint, answers this question so completely that I

here repeat it: "We think you are in error in calling the action of the Association, or the action of any one of its members, 'boycotting.' A boycott means to refuse to sell or do business with a concern, and to prevent anybody else from doing business with a concern on any conditions. This is not the attitude of the Association with you. The Association has implored you over and over again to abide by your contracts and sell goods as your neighbors do, and you have distinctly defied them and told them that you would do just exactly as you liked. There is no 'boycott' in this, good friends, and nobody knows it better than you do; and you also know that, even if you choose to call it a boycott, you can end the boycott in twenty-four hours by simply agreeing when you sign a document that you will keep it."

Complaint is made with reference to the watching or spying upon plaintiff's business. All there is of this is the watching for the purpose of determining who the druggists were that furnished the plaintiff with proprietary goods in violation of the contract plan under their agreements with the proprietors. I think there is nothing in this calling for the intervention of a court of equity. The whole success of the plan adopted for conducting the business depended upon the faithful observance of the contract of the druggists with the proprietors, for whom they were acting as agents. If one could be permitted to violate his contract it would seriously prejudice all the dealers who lived up to the provisions of their contract and carried it into execution in good faith. As was said in the letter of Parke Davis & Co., to plaintiff's predecessor, under date of February 12, 1889 : "The contract in force between us and the members of the Wholesale Drug Association during the three years prior to 1887 was objectionable to many because of the opportunities offered to those so disposed for an evasion of its provisions; thus, those who lived up rigidly and honestly to their agreement were made to suffer for the benefit of those disposed to regard their agreement and promises simply as a means for taking advantage of others who fulfilled their agreements."

I am, thus, brought to a consideration of the reasons for objecting to the plan by the plaintiff. As stated in the allegations of the complaint they are as follows: " That all of the said manufacturers and proprietors who have adopted the said rebate or contract plan for the sale of their respective proprietary goods were persuaded to adopt it entirely by the representation of the benefit which would accrue to the majority of their distributing agents or vendees, the wholesale and jobbing druggists, *who were unable to handle the goods as cheaply as the few who could command large capital.*" It is also alleged that the firm of John D. Park & Sons and this plaintiff since its organization, before the happening of the matters alleged in the complaint, had made large purchases as wholesale and jobbing druggists, of the proprietary goods of all or nearly all of the various manufacturers, and had it not been for the happening of the matters set forth in the complaint it would have continued to make large purchases as wholesale and jobbing druggists of such goods and would have been an active and constant competitor of all the other wholesale and jobbing druggists in the United States. The meaning of these allegations is obvious. It is that the plaintiff or the firm of John D. Park & Sons, of which the plaintiff is successor, could command large capital, and by reason of this they could purchase proprietary goods in larger quantities and more cheaply than the other wholesale and jobbing druggists, and that by reason of the adoption of the contract plan the plaintiff was unable to so do. Under the contract plan the prices of these goods were made uniform for fixed quantities, and dealers possessing large capital and thereby enabled to purchase in large quantities could not purchase for a less sum than the ordinary wholesale and jobbing druggist, and not being able to purchase for a less sum could not handle the goods more cheaply. The situation is not new. It is one to which the attention of the public has been frequently drawn in recent years. The great merchants possessed of large capital will persuade and induce manufacturers to sell to them more cheaply in consequence of their

taking large quantities, and thus they are enabled to undersell and drive out of business the small merchants in their vicinity. I am not here going to question the right of the big fish to eat up the little fish, the big storekeeper to undersell and drive out of business the little storekeeper, but I do believe that the little fellows have the right to protect their lives and their business, and if they can by force of argument and persuasion induce manufacturers to establish a uniform price for fixed quantities so that they can purchase as cheaply as the great merchants and thus compete with them in the retail trade, they have the right to do so, and that no court of equity ought to interfere and restrain them from the exercise of this privilege.

The authorities have been largely discussed by my associates. I do not understand that we widely differ with reference to the law. Our chief controversy appears to arise out of the different conclusions to which we have arrived with reference to the allegations of facts contained in the complaint.

The judgment should be affirmed, with costs.

PARKER, Ch. J.   It does not seem to me that this case comes within the principle of the *Union Blue Stone Co. Case* (164 N. Y. 401), the *Berlin & Jones Envelope Case Co.* (166 N. Y. 292) and kindred cases — and I am not without some acquaintance with those cases, inasmuch as the judgment affirmed in the first case was directed by me at Circuit, and the opinion in the last written by me.   Nor is there any case in this court, so far as we have found, precisely analogous, but the principle underlying the decision in *National Protective Association* v. *Cumming* (170 N. Y. 315) is applicable for reasons which I shall, as briefly as possible, suggest.

It will be observed that this is not a case where the manufacturers have combined for the purpose of raising prices to the consumer of the remedies they manufacture, nor does it appear that it is the object of the wholesale dealers, who form the aggressive part of this association, to increase the price to the consumer.   If the object be to raise the price to

the consumer and thus increase the profits of the manufacturer and the agency by which he passes his goods on to his retail dealers, then it may well be that it is void because in restraint of trade within the principle of the *Union Blue Stone Co.* case and the *Berlin and Jones Envelope Co. Case* (*supra*), notwithstanding the impression that there may be in some judicial minds, and possibly in others, that proprietary remedies are not entitled to be classed among the necessaries of life. The phrase " necessaries of life," as used in connection with the subject of restraint of trade, must certainly be regarded as broad enough to include articles of which the public consume $60,000,000 worth in a year.

The object of this association, however, is not to fix prices at which the manufacturer's goods must be sold. It attempts no restraint whatever upon the manufacturer in making prices. He may lower or increase the price at his pleasure. In that respect he is precisely as free as he was before the association was formed and he became a member of it. He may name the price which the consumer shall pay for his article now as he could then, which means that he can both make the price and enforce it by contract. (*Garst* v. *Harris*, 177 Mass. 72; *Fowle* v. *Park*, 131 U. S. 88; *Walsh* v. *Dwight*, 40 App. Div. 513.)

That being so, the query naturally is, What restraint does the association put upon the manufacturer and what can be the purpose of this association which does not seek an increased profit at the expense of the masses?

The answer, as I read the complaint, is that the distributing agencies — the wholesale dealers — by which the manufacturer's goods are passed on to the retailer, where the public may obtain them, have been taught by experience two things: *First.* That manufacturers have favorites to whom they will give a larger rebate than to wholesale dealers as a class, and generally the favorite is the person or corporation buying the greatest amount of goods, as strong firms or corporations like this plaintiff with a business of such dimensions that it claims damages in this case of one-half million of dollars. *Second.*

That there are wholesale dealers who for the purpose of getting clients away from their competitors will give them some part of such extra rebate. To remedy this difficulty was the leading object of the association, and it was sought to be accomplished by placing all the wholesalers upon an equality, so that one should have no advantage over the other in dealing with retail dealers, a result which seems altogether desirable, because it is in the line of fair dealing.

Indeed, the principle which they undertake to secure in this case by contract is like that which the Sherman Act attempted to secure in part, namely, equal freight rates to all interstate commerce shippers from common carriers. Before that act was passed the claim was made, and evidence was adduced in support of it, that rebates of such magnitude were allowed in occasional instances to favorite shippers that it contributed largely, if not entirely, toward driving others out of business, which was deemed so against public policy that Congress set about placing all parties on an equality as to the cost of shipping goods by interstate common carriers. Assuming, as we must, that this legislation was along proper lines for the purpose of protecting the principle of competition at a point where it seemed to be open to attack, it necessarily follows that it is in accord with public policy that these wholesale dealers may attempt to secure to themselves by contract like fair dealing on the part of the manufacturers, namely, that the rebate from the latter's "long prices," which the manufacturer allows as compensation to the wholesaler for distributing the goods to the retailers, shall be alike to all of them.

Before this association was formed, the complaint alleges, there was no fixed rebate, so that the manufacturer could and did allow to some a greater rebate than he did to others, and that such a course of dealing might operate to enable one wholesaler to profit greatly at the expense of the others goes without saying. These agencies for distribution between the manufacturer and the retailer, called the wholesale dealers, set about protecting themselves against what they deemed

unfair competition which resulted to them when a manufacturer saw fit to give some one dealer a much larger rebate than allowed to them as a class.

After forming the association they adopted, first, what is called in the complaint the *rebate* plan. By that plan the proprietor fixes the price of his article known as the "long price" and agrees to pay expressage and cartage to any point from which it may be ordered. The result is that if the long price is one dollar, the article is sold to the consumer at exactly that price in all parts of the country, which is very important to the proprietors, as they view it ; and it must be borne in mind steadily that it is settled by authority that the proprietor of patent medicines has the right to fix the price at which his article shall go to the consumer, and a druggist who takes his articles for sale under an agreement that he will maintain the price is liable to respond in damages if he violates the contract. (*Garst* case and others, *supra.*) This plan was found to be insufficient to accomplish the desired result because distributors violated their contracts to sell at the "long price."

The *Detroit* plan was then devised, and all the proprietors were to sell their goods only to wholesale or jobbing druggists and not to the retail trade, and the committee on proprietary goods, which was composed of wholesale druggists, members of the association, agreed to furnish proprietors lists of wholesalers who could be depended upon to keep their contracts, and *cut off lists* of dealers who did not keep their contracts or who bought as a mere cover for dealers who were known not to keep their contracts. Under this plan every wholesaler is at liberty to buy all the goods he chooses of the manufacturers and can secure the same rebate as any member of the association, but he has to agree to the plan and he has to keep his agreement. This the plaintiff refuses to do, and, under the agreement which the manufacturers have with this association, they are not at liberty to give plaintiff the benefit of the rebate rate which they give members of the association, so long as he insists upon it that he will not abide by the

rules of the association.   He can have all the goods that he
wishes provided he pays " long prices " for them, but he can-
not buy goods of the manufacturers who belong to this asso-
ciation at any less than the " long price ; " in other words, he
cannot get the benefit of the rebate unless he will agree to
come in and be bound by the rules of the association.

Wholesalers of whom complaint is made are not, therefore,
attempting to prevent plaintiff from enjoying all the opportu-
nities for profitable trade which they enjoy, for they have
invited him to become a member, indeed, have urged him to
do so, and assured him in common with them of every advan-
tage which they possess ; but they *do* attempt to prevent him
or any other dealer from making uncertain in its rewards, if
not wholly unprofitable, the business of distributing proprietary
articles among retail dealers.

Plaintiff once attempted to do business in accord with the
association, but apparently reached the conclusion that it would
be more profitable to him in the end to deal independently, and
so he refused longer to be bound by the rules of the association,
and, hence, the strife between the association and plaintiff
which has culminated in this suit, plaintiff seeking to get the
benefit of the same or a larger rebate than the members of
the association without being bound by its rules, and the asso-
ciation doing its utmost to persuade the manufacturers not to
give him the benefit of the rebate so long as he continues to
oppose the policy of the association.

The position of the respective contestants is not far differ-
ent, it will be seen, from that of the parties to the action of *Nat.
Protective Assn.* v. *Cumming* (*supra*).   Each is striving as
against others to help itself or himself, and the question is here,
as in that case, whether defendants in taking such action as they
did to prevent plaintiff from getting the business they wanted
are violating any rule of law.   The wholesale dealers had the
right to contract to secure such amount of rebate from the
manufacturers as would reasonably compensate them for their
services in distribution, together with the money invested.
It is not claimed that the rate of compensation agreed upon

was unfair, and if there could be such complaint it is difficult to see who could make it except the manufacturers themselves, and they do not. It was clearly legal for any one of the wholesale dealers to sign the agreement and to bind himself to sell at such prices as the manufacturer of the article should see fit to name as the selling price; the right to fix the price belonging to the manufacturer it was proper for the wholesaler to agree to recognize that right and govern himself accordingly. He had the right to insist that in consideration of his performing those conditions, in accordance with the wishes of the manufacturer, the latter should not give to other dealers the rebate provided for members of the association unless such dealer should agree to be bound by the same conditions the members of the association took upon themselves; and he had a right to agree that in order to secure the due carrying out of the agreement according to the spirit thereof he would furnish to the manufacturer such evidence as he might secure from time to time tending to show that members of the association were directly or indirectly violating its rules, and that which he could do alone, he and they could do as members of the association, provided of course their coming together did not operate against the rights of the general public, but as against other selling agents like themselves, no other public interest being affected, there could be no doubt of their right to agree with each other to do what any of them could do alone. The members of the association not only had the right to inform the manufacturers about those members within it and the dealers without it who were violating the plans agreed upon, but they also had the right to take such legitimate and honorable means as were within reach to ascertain what persons were violating the rules, and to give notice of it to all of the members of the association. But that course operated, says the plaintiff, in effect to deprive me of the opportunity of buying goods on terms as favorable as the defendant wholesale dealers bought them. True, but it may be answered that you *could* buy them on the *same* terms as the

members of the association, which terms contain conditions governing the sale and the conduct of the members. Instead, you prefer to take the business chances to be found outside of the association, and, before the courts will help you, you must show that the plans of the association, or its conduct under those plans, are unlawful as against you.

The position attempted to be taken at this juncture by the plaintiff is, that granting the plans which the members of the association adopted were legal, nevertheless the wholesale dealers can be proceeded against in this suit, because they compelled some or all of the manufacturers against their will and inclination to refuse to sell their goods to plaintiff by threats, intimidation, blacklisting and other unlawful acts of the association. This language has a formidable sound, but subjected to the same analysis as was given to the word " threats " in the connection in which it was used in the *Nat. Protective Association Case* (*supra*) it will prove to be without force. There are no threats alleged in this complaint on the part of defendants to do anything except that which they have a right to do, if the views so far expressed be sound, and we said in that case, and it is proper to repeat here, that a man may threaten to do ·that which the law says he may do, provided that, within the rules laid down in certain cases therein cited, his motive is to help himself. If there be any other " intimidation " of manufacturers than that to be found in the agreements and written plans of this association and the steadfast purpose on the part of its members to carry them out according to their letter, it is not to be found in the complaint. The term " blacklisting " refers to the course of defendants in notifying the trade in effect that the plaintiff is outside of the association, and prefers to stay out of it rather than be bound by the rules and regulations which other members of the trade regard as fairest and best to all, and insisting that the penalties of such a course shall be meted out to him, namely, that he shall not be allowed any rebate upon any of the manufacturers' goods so long as he shall retain that position. The facts alleged by them are true. The notification

is a part of the plan agreed upon by all, and the plaintiff courted it rather than do business on the same basis as his competitors, who together handled about ninety per cent of the proprietary articles sold.

The plaintiff's characterization of the acts of the defendants do not establish a cause of action against the defendants if the acts themselves do not, and clearly their acts do *not*, inasmuch as they are not aimed at preventing the plaintiff or any one else from participation in the trade to the same extent and on the same basis as themselves, but are intended simply to prevent plaintiff and others from enjoying the same or greater rebates than they get without bearing the burdens which they assume as a condition of receiving them, unless it may be said that the fact that they have agreed upon a basis of transferring the goods from the manufacturer that insures only reasonable profit and security to them as distributing agents is illegal and void. And this would seem to be impossible in view of the fact that the wholesale dealers have not secured the authority to, nor attempted to, restrict either the price or the quantity sold of the goods dealt in. One of these elements has always been present in the cases of the past in this state, in which it has been held that there existed a combination in restraint of trade, which was against public policy and void.

It will be seen, therefore, that this is a controversy between opponents in business, neither side trying to help the public. Nor will the public be the gainer by the success of either. The motive behind the action of each party is self-help. It is the usual motive that inspires men to endure great hardships and take enormous risks that fortune may come. In the struggle which acquisitiveness prompts, but little consideration is given to those who may be affected adversely. Am I within my legal rights? is as near to the equitable view as competitors in business usually come. When one party finds himself overmatched by the strength of the position of the other, he looks about for aid. And quite often he turns to the courts, even when he has no merit of his own, and makes himself for the time being the pretended champion of the public wel-

fare in the hope that the courts may be deceived into an adjudication that will prove helpful to him. Now, while the courts will not hesitate to enforce the law intended for the protection of the public because the party invoking such protection is unworthy, or seeks the adjudication for selfish reasons only, they will be careful not to allow the process of the courts to be made use of, under a false cry that the interests of the public are menaced, when its real purpose is to strengthen the strategic position of one competitor in business as against another.

I concur with Judge HAIGHT.

The judgment should be affirmed, with costs.


MARTIN, J. (dissenting). I am unable to concur in the opinion of the learned Appellate Division or in the conclusion reached by a majority of this court. The demurrers to the amended complaint were sustained, both at the Special Term and in the Appellate Division, upon the ground that the complaint did not state facts sufficient to constitute a cause of action, although apparently for different reasons. Several of the defendants stated, as additional grounds of demurrer, that the court had no jurisdiction over them, and that it had no jurisdiction of the subject of the action. The latter grounds were not considered or passed upon by either court, and obviously cannot be sustained.

The amended complaint was served in September, 1898. The defendants demurred, and the issue arising upon such demurrers was decided by the Special Term in May, 1900, and subsequently the final judgment was entered. The complaint is exceedingly lengthy, containing about one hundred and fifty pages and about six hundred folios. The labor necessary to a careful analysis of the multifarious allegations in this lengthy complaint is well nigh appalling, and would naturally provoke a desire to avoid it if possible. But as the case is important, affecting not only the parties to this particular litigation, but involving a principle which affects the general public, its dealings in a large class of merchandise, the legality of monop-

olies organized to prevent competition in articles in common use, and the right to employ as a means to secure that end the boycotting or intimidation of persons engaged in the same general business, our duty demands the performance of that labor, however burdensome. Therefore, although it is impossible within the limits of this opinion to state all the material allegations of the complaint, yet a brief statement of the general and most material, including a general outline or history of the transactions upon which it is based, is quite essential to an understanding of the case.

The plaintiff is a Kentucky corporation, and its principal place of business is in Cincinnati. Its business consists of the manufacture of proprietary articles or patent medicines, the purchase of the same class of articles from other manufacturers, and in selling such goods to retail dealers. Before the acts complained of its trade was large and profitable. The defendant association was organized in 1876 under the name of the Western Wholesale Drug Association. Its name was changed in 1882, and it is an unincorporated association. It consists of active and associate members. The former are wholesale and jobbing druggists, and druggists who also own and manufacture certain proprietary goods, who alone comprise the active members of the association. Proprietors of proprietary articles who only manufacture and sell their own goods, and manufacturers of chemical or pharmaceutical preparations not interested in proprietary goods, constitute the associate members, but have no control or voice in the business or affairs of the association. The active membership includes at least two-thirds of the wholesale dealers in the United States, who control more than ninety per cent of the wholesale and jobbing trade. Formerly patent medicines and proprietary articles were sold by the manufacturers through agents who received a commission for their compensation. The trade, however, is now almost exclusively carried on through wholesale dealers and jobbers. The rebate or discount allowed to the wholesale dealers constitutes their profit. Before the acts complained of the discounts or commission

allowed by manufacturers were not fixed or uniform, nor was the custom as to delivery and charges allowed, in all instances, the same, and there was then an active competition between the various wholesale dealers. With this situation and method of transacting the business the manufacturers were content, but the wholesale dealers and jobbers were dissatisfied. In March, 1876, the association adopted a schedule of prices at which proprietary goods should be sold by each wholesale and jobbing druggist, and they were to be sold at the prices thus established without competition. Afterwards, and in 1882, the association adopted a plan under which the manufacturers were to be required to sell their goods. By it there was to be a contract between the manufacturer and buyer, in accordance with which the latter was to maintain certain prices, fixed by the proprietor, the articles to be charged and invoiced at the full jobbing prices, the difference between the proprietor's price and the jobber's to be allowed to the buyer provided he entered into a contract to maintain prices, the rebate to be not less than ten per cent, and wherever sent the manufacturers to pay freight on all the goods sold.

In October, 1883, the association, by its active members, declared its purpose to pursue a continued and untiring opposition to the sale, by its members, of articles of such manufacturers as should not adopt its plan, or, having adopted it, should withdraw therefrom. Thereupon many of the manufacturers, at the solicitation of the officers, active members and agents of the association, adopted its plan, until nearly all the manufacturers in the United States were induced by the association to do so. This was procured entirely by the representation of the association as to the benefit which would accrue to the majority of their distributing agents or vendees who were unable to handle the goods as cheaply as the few who could command large capital, and the manufacturers were compelled to adopt it to protect themselves against the association and its active members who constituted a great majority of their customers. All the active members of the association agreed and bound themselves to buy goods only of manufacturers who

adopted the rebate plan, and not to cut or vary prices, save by the discounts and terms of credit mentioned in the contract.   The manufacturers who adopted this plan have adopted substantially the form of contract required by the association, except in states having anti-trust laws, where written contracts are not required, but the purchaser is required to make a verbal agreement to the same effect or to send letters agreeing thereto.   The manufacturers who adopted that plan were compelled to do so to protect themselves with the wholesale dealers.   The latter have bound themselves to give to retailers who are their customers only the terms of credit and discounts fixed by the contract, and not to pay freight or to deliver the goods.   The active members of the association are combining and conspiring to obtain an exclusive control of the wholesale and jobbing trade, as between the manufacturer and the retailer, in all classes of patent medicines or proprietary goods; to regulate and control the methods upon which such trade shall be carried on; to control the prices, discounts, allowances for freight and terms of credit upon which such goods shall be sold to the various retail druggists throughout the United States; and also to destroy and prevent competition between the wholesale and jobbing druggists in the sale of such medicines or goods, and to limit and restrict the business of each of the wholesale dealers, or such of them as are in one locality, to certain exclusive territory, tributary or proximate to each.

Prior to the matters set forth many of the wholesale dealers were purchasers of goods of the plaintiff, and but for the action of the association would now be.   Before its action the plaintiff was a large purchaser, as a wholesale dealer, of nearly all the manufacturers of such goods, especially of those who have adopted the plan of the association, and would have continued but for the matters stated in the complaint.   The plaintiff, so far as able, always has been an active competitor in the wholesale and jobbing drug trade, and has refused to combine and conspire with the defendants for the control of the trade and the destruction of competition therein, or to restrict its

business to a limited territory. It has· sold the goods of all the manufacturers at such prices and upon such terms as to· credits, discounts, allowances for boxing, cartage and for freight as it deemed advisable. The active members of the association now claim that the manufacturers are bound not to sell to any wholesale dealer except upon the terms and conditions imposed by the association, nor unless he signs such contract. They also claim that any person who purchases of a rebate manufacturer, unless he complies with the terms of the contract, is not to be trusted or allowed to handle the goods of such manufacturer.

In 1885 a committee of the association was authorized to and called upon rebate manufacturers to decline all the plaintiff's orders until it was reinstated by that committee. Thereupon many of them, to protect themselves against the action of the association, declined to sell goods to the plaintiff. In September, 1886, the association resolved that no agreement, unaccompanied by the rebate contract, should be considered on the rebate plan, and that where a firm had, by the committee, been found guilty of violating it, the manufacturers should withhold supplies. Thereafter the committee, charging the plaintiff with a violation of the plan, sent circulars to that effect to the manufacturers urging them to carry out the wishes of the association, and sent various letters to the same effect to rebate manufacturers and to others who had not adopted the plan, and the association, by resolution, also declared that any member who should sell to a dealer whose orders had been declined at the request of the committee, should be expelled, and thereupon every effort was made to induce all the members of the association and all the manufacturers to refuse to sell goods to the plaintiff or to any person who would sell it goods. In 1887 it sent out another circular to the effect that any member who supplied goods to a dealer whose orders had been declined at the request of the committee, was guilty of violating the spirit of his contract and should be expelled, and advised the manufacturers to scrutinize orders coming from unusual quarters, and predicted

that the firm now in warfare against the rebate plan could not long continue its methods.  After receiving these various notices and resolutions, many of the defendants, both wholesale dealers and manufacturers, refused to sell to the plaintiff, or to any person who had supplied it with goods, and many of them demanded from each customer a contract by which he agreed not to sell to the plaintiff until it should be reinstated.

In 1888 a sub-committee of three was appointed by the association with power to order all supplies withheld from any firm or individual whom it found guilty of violating its contracts, until the committee should become satisfied that such practices would be discontinued, and to request manufacturers to refuse supplies to any person thus found guilty.  The association also authorized the omission from future official lists of rebate articles, the goods of such proprietors as should continue selling to violators of the agreement, and gave a committee power to employ persons to investigate charges against any dealer.  Such committee ordered all supplies of rebate goods to be withheld from the plaintiff, sent a circular to each manufacturer calling upon him to comply with such order, and many of such manufacturers thereafter refused to sell to the plaintiff, being compelled thereto to protect themselves against the wholesale dealers' association and its active members.  The committee also made efforts to ascertain from whom the plaintiff purchased supplies, and employed detectives for that purpose, who spied upon the plaintiff's business and reported to the committee the names and places of business of persons shipping it goods.  It thereupon sent and is about to continue sending circulars to manufacturers and wholesale dealers, known as "cut-off lists," containing the names of persons reported as selling to the plaintiff, and it thereupon made efforts and is about to continue its efforts to induce manufacturers not to sell to persons on such cut-off lists, and by reason thereof many manufacturers have refused to sell to persons thereon.

In 1893 the association adopted the Detroit plan, by which it required the manufacturers to compel the purchasers of

their goods to accept a contract to become selling agents, to take the goods in fixed quantities, and in consideration of their maintaining fixed selling prices and complying with all the regulations of the association they were to receive a fixed per cent for selling and a fixed discount for cash, the manufacturer to pay the freight, the prices not to be cut, and, if cut, the agency to be withdrawn and all other agents notified not to sell them, and the manufacturers to sell only through selling agents. It then provided for the organization of a similar association in each town, which was to be given a list of all rebate goods. Thereafter the manufacturers were in effect required to submit full lists of all their customers to the association.

In December, 1893, the committee sent a circular to manufacturers and wholesale dealers, asking the former to furnish it a list of all their customers, and with this circular was a list of all persons who were entitled to purchase rebate goods, which did not include the plaintiff or persons selling to it. Thereupon many rebate proprietors, at the instance of the committee, agreed to confine their sales to the persons named on the lists, refused to allow to others any rebate, allowances or discounts, and furnished the committee with full lists of their customers not named on the list, from whom they received orders for any of their goods. The committee is making every effort to ascertain what manufacturers are still selling to the plaintiff, and is employing detectives for that purpose, who watch and spy upon shipments made to the plaintiff and report the names of rebate manufacturers who are selling it goods. Similar action on the part of the committee was continued through 1894 which directly pointed to the business of the plaintiff, and the committee was authorized to continue its aggressive work against those who should not comply with the rules of the association, and funds were provided for that purpose.

In October of that year circulars were sent by the association to all manufacturers and wholesale dealers, whether members of the association or not, embodying the substance

of its resolutions, which in effect were a reaffirmance of its intention to uphold its plan; that its committee should notify its members of the action of manufacturers who, having had their attention called to the matter, continued shipping their goods to the " Cincinnati cutter " (meaning the plaintiff), or to those who supply him, and notify such manufacturers that their articles would be taken from the rebate list, and in publishing the official list of rebate articles issued by it such names would be omitted therefrom; that the committee on proprietary goods be authorized to continue the aggressive work against cutters inaugurated during last year, and to enable them to do this most effectually, means fully adequate to provide assistance be placed at their disposal. With such circulars, letters were sent for those receiving them to sign, by which they should agree not to ship goods to violators of the contract until they received assurances that such violations were discontinued, and, further, to furnish the committee with lists of their quantity buyers. Nearly all the wholesale dealers and manufacturers signed and returned such letters to the committee, being compelled to do this in order to protect their own business. Nearly all the wholesale and jobbing druggists are making and will continue to make every effort to induce manufacturers to confine the sale of their goods to the persons named in the list containing the names of persons claimed to be entitled to rebate goods, and all or nearly all the rebate manufacturers have refused to sell goods to the plaintiff, some of them stating that they would like to fill its orders, but that their relations with the association prevented, and that it would not pay them to antagonize the trade by selling to the plaintiff. The correspondence alleged in or annexed to the complaint shows clearly that many of the manufacturers who formerly sold to the plaintiff were compelled by the association to forego their own desires and disposition in that respect, and to refuse the plaintiff's orders by reason of the pressure to which they were subjected by the association and its active members.

The various resolutions, contracts and agreements adopted

by such association to prevent the plaintiff from conducting a wholesale and jobbing business in proprietary goods tended to injure and destroy its business, and the plaintiff's business is being injured and destroyed by the unlawful acts of the defendants. Nearly all the rebate manufacturers who have been willing to sell to the plaintiff or to persons who would supply it, are refusing to do so, and will refuse unless the acts of the association and its active members are restrained, and that their acts are such as to irreparably damage the plaintiff's business, and it cannot obtain adequate relief at law without a multiplicity of suits.

With other relief demanded, the plaintiff seeks by this action to restrain the association, its active members, committees and agents, from making and continuing its and their efforts to prevent the plaintiff from purchasing, and the manufacturers from selling their goods to the plaintiff, by threats, intimidation or other improper means, from continuing a monopoly of such business, and from performing any act or acts that will impair or destroy competition in the sale thereof.

While this is a meager and brief synopsis of the complaint, and falls far short of containing all the material allegations therein, yet, as it gives a general outline thereof, it is perhaps ample to enable us to consider the question of its sufficiency. As all the allegations of the amended complaint, as well as all that can by reasonable and fair intendment be implied therefrom, are admitted by the defendant's demurrer, we are presented with the question whether they constitute a cause of action entitling the plaintiff to any relief whatever. (*Marie* v. *Garrison*, 83 N. Y. 14; *Sanders* v. *Soutter*, 126 N. Y. 193; *Coatsworth* v. *Lehigh Valley R. R. Co.*, 156 N. Y. 451; *Standard Fashion Co.* v. *Siegel-Cooper Co.*, 157 N. Y. 60; *Ahrens* v. *Jones*, 169 N. Y. 555, 559.) Under the recent authorities, pleadings are not to be strictly construed against the pleader, but averments which sufficiently point out the nature of the plaintiff's claim are sufficient if, under them, he would be entitled to give the necessary evidence to establish a cause of action. (*Rochester Ry. Co.* v. *Robinson*, 133 N. Y.

242, 246; *Coatsworth* v. *Lehigh Valley R. R. Co.*, 156 N. Y. 451, 457.)

In determining that question, we must assume that the association was organized and continued for the purpose of monopolizing and controlling the business of wholesale druggists and jobbers in the sale of proprietary articles or patent medicines in the entire United States, to prevent competition therein, and to compel the payment of greater and uniform commissions for the sale thereof.   This was accomplished by forming a combination of two-thirds in number of all the wholesale druggists and jobbers in the United States, transacting more than ninety per cent of all that business, and then by requiring them to refrain from selling such goods for a less commision or a lower compensation than was established by the association, and to decline to purchase goods of any manufacturer who should refuse to comply with its demands or who refused to transact his own business in accordance with such rules and regulations as the association had, or from time to time might adopt.   Thus, as is usual in the creation of such trusts or monopolies, the purpose of the association was to be accomplished by a combination to ruin and destroy the business of any manufacturer or wholesale dealer who should refuse to be controlled by the association in the transaction of his own business.

It is a plain perversion of the complaint to say that it states a claim or cause of action involving merely the right of a manufacturer to sell his goods to whom he will.   The question presented by the complaint is whether individuals, firms or corporations have a right to enter into a combination or conspiracy to prevent manufacturers of patent medicines from maintaining competition with others in the sale of their goods or from selling them in such manner and upon such terms as they shall desire or agree upon with their customers, and in case they do, whether the members of the combination have a right to boycott such articles and the manufacturer as well. That such was the purpose of the association and that it and its active members have carried that purpose into effect, is

plainly alleged and not denied.  It is also alleged that any person engaged in the manufacture of such commodities, who does not agree to enter into the arrangement required by that combination, or does not fulfill such agreement, is to be black-listed by them and they are to make every effort in their power to destroy his business.

Moreover, the association maintains a committee to spy out the business transactions of manufacturers, to ascertain if they sell to the plaintiff or to persons not members of the association or to persons who sell to others not such members, and if it decides such to be the case to send to practically all the whole-sale dealers in the United States a notice in effect requiring them to refuse to deal with such manufacturers, and the pen-alty to such dealers for refusal is that all the members of the association will decline to purchase any of their goods.

It is to be observed that the claim of the plaintiff is not that the manufacturers have voluntarily committed any wrongful acts of which it complains, as it is plainly alleged that they desire to sell it goods, and would do so but for the wrongful acts of the association and its active members.  Its claim is that the National Wholesale Druggists Association and such members have committed the wrong from which it has suf-fered by unlawfully combining together for the purpose, and by requiring manufacturers to refuse to sell goods to the plaintiff, and by enforcing that requirement by requiring a refusal by all its members to deal in such manufacturers' goods, to procure others to refuse to deal in them, and to pub-licly advertise such manufacturers as unworthy dealers, and thus injure or destroy their business.  It is alleged and admit-ted that many, if not most, of the manufacturers, have been compelled against their will or inclination to refuse to sell their goods to the plaintiff by threats, intimidation, blacklist-ing and other unlawful acts of the association and its active members.  From the outset the action of the association and of its active members has been aggressive, persistent and con-tinuous to ruin or exclude from business any manufacturer or dealer who should sell any of this class of goods to the plaintiff

or others similarly situated.  This scheme was planned, origi-
nated and forced upon the manufacturers by the association
and its active members.    The manufacturers did not seek
or inaugurate this plan, and adopted it only because they
were compelled to do so to protect their business against the
acts and threats of such active members, who alone desired
its adoption and enforcement to obtain increased compensa-
tion, and to maintain prices without regard to the expense of
conducting business.    Under it the business of the manu-
facturers was to be and has been controlled by a combination
of their customers.    It is true that there was reserved to the
manufacturers the right to establish a single price at which
their goods might be sold, but it must be uniform  and fixed
without regard to the expense of delivery or the amount of
the sale.    The right to establish the amount of commissions
to be paid and to determine to whom their goods should be
sold were withdrawn, and no right was left them to make
any agreement on the subject of their own property, or to
make any agreement in regard to selling it with any person
other than those that were selected by the combination.    In
other words, the manufacturers were compelled by their cus-
tomers to surrender to the latter practically all authority as to
the manner of the sale of their own property and the selec-
tion of their customers, and unless they did their business was
to be destroyed.

The foregoing facts are in substance alleged and admitted,
and, hence, the question arises whether the association and its
officers, agents, employees and active members by thus inter-
fering with the plaintiff's business, have pursued a course of
action that constitutes an invasion of or trespass upon its
rights which renders them liable therefor.  If this combina-
tion was formed to accomplish an unlawful purpose, or if its
purpose has been accomplished by unlawful means, the plain-
tiff who has alleged special damage can maintain an action to
recover by reason thereof.

Therefore, in the further discussion of this case we are led
to consider, *first,* whether the purpose for which the combina-

3

tion was formed was lawful; and, *second,* whether it was to
be accomplished by lawful means.   As to the *purpose* it is
obvious from the facts alleged that the conspiracy or combi-
nation was formed to restrain trade or commerce, to monopo-
lize the sale of goods in common use and to prevent competi-
tion therein.   Such being its plain purpose it is equally clear
that. it was unlawful.   From a very early day it has been
the policy of this state and most other jurisdictions that free
and unrestricted competition in all business pursuits must be
maintained, and the business maxim that 'competition is the
life of trade' has been established and sustained by their
courts and legislation.  While this principle has not been thus
firmly and universally settled without discussion as to whether
it does not work a greater hardship than advantage by crush-
ing out weaker competitors and causing disaster to others by
reduction of prices, yet, notwithstanding these arguments,
the consideration which the question has received has led to
the conclusion that public policy requires the continuance
and enforcement of the rule of competition as a principle
controlling business affairs in the various commonwealths.
This principle of political economy is not based alone upon
the theory that combinations to prevent competition will, of
necessity, enhance the price, as there are notable instances
where such combinations have, even permanently, reduced the
price of articles thus traded in or manufactured, but it
is founded upon the theory that such combinations may, as
they usually will, enhance the price and also drive small and
worthy dealers out of business.   In *People* v. *Sheldon* (139
N. Y. 251, 263), ANDREWS, Ch. J., said: "The question is,
was the agreement, in view of what might have been done
under it and the fact that it was an agreement the effect of
which was to prevent competition   *   *   *   one upon which
the law affixes the brand of condemnation.   It has hitherto
been an accepted maxim in political economy that 'competi-
tion is the life of trade.'   The courts have acted upon and
adopted this maxim in passing upon the validity of agree-
ments, the design of which was to prevent competition in

trade, and have held such agreements to be invalid. * * *
The gravamen of the offense of conspiracy is the combination.
Agreements to prevent competition in trade are in contem-
plation of law injurious to trade, because they are liable to be
injuriously used." The right of the plaintiff to recover in
this action does not rest upon the common law alone, as the
Revised Statutes provided, " If two or more persons shall
conspire to commit any act injurious * * * to trade or
commerce, * * * they shall be deemed guilty of a mis·
demeanor " (4 R. S. pt. 4, ch. 1, tit. 6, § 8, subdiv. 6), and this
was re-enacted in subdivision 6 of section 168 of the Penal
Code; while subdivision 5 provided " If two or more persons
conspire * * * to prevent another from exercising a
lawful trade or calling, or doing any other lawful act, by
force, threats (or) intimidation *y* * * each of them is
guilty of a misdemeanor." In 1897 the legislature passed an
act which provided : " Every contract, agreement, arrange-
ment or combination whereby a monopoly in the manu-
facture, production or sale in this state of any article or com-
modity of common use is or may be created, established or
maintained, or whereby competition in this state in the supply
or price of any such article or commodity is or may be restrained
or prevented, or whereby for the purpose of creating, estab-
lishing or maintaining a monopoly within this state of the
manufacture, production or sale of any such article or com-
modity, the free pursuit in this state of any lawful business,
trade or occupation is or may be restrained or prevented, is
hereby declared to be against public policy, illegal and void."
(L. 1897, ch. 383, § 1.) That the acts alleged to have been
committed by the defendants were injurious to trade and com-
merce, created a combination to monopolize the sale of articles
in common use, restrained competition in the supply of articles
or commodities, and established and maintained a monopoly
restricting or preventing trade, is manifest, and, therefore,
the combination or conspiracy of the defendants was for an
illegal purpose and the acts performed by them under it were
also illegal. (*Hooker* v. *Vandewater*, 4 Denio, 349; *Clancey*

v. *Onondaga Fine Salt Mfg. Co.*, 62 Barb. 395; *Stanton* v. *Allen*, 5 Denio, 434; *Leonard* v. *Poole*, 114 N. Y. 371; *People* v. *Fisher*, 14 Wend. 9, 14; *People* v. *Sheldon*, 139 N. Y. 251, 261; *Arnot* v. *Pittston and Elmira Coal Co.*, 68 N. Y. 558; *Curran* v. *Galen*, 152 N. Y. 33, 37; *People* v. *Milk Exchange*, 145 N. Y. 267; *Pittsburg Carbon Co.* v. *McMillin*, 119 N. Y. 46; *Judd* v. *Harrington*, 139 N. Y. 105; *Cummings* v. *Union Blue Stone Co.*, 164 N. Y. 401; *Cohen* v. *Berlin & Jones Envelope Co.*, 166 N. Y. 292; *Matter of Davies*, 168 N. Y. 89, 101; *United States* v. *Freight Assn.*, 166 U. S. 290, 322; *United States* v. *Joint Traffic Assn.*, 171 U. S. 505; *Addyston Pipe and Steel Co.* v. *United States*, 175 U. S. 211; Beach on Modern Contracts, § 1582; *Richardson* v. *Buhl*, 77 Mich. 632, 658; *State* v. *Nebraska Distilling Co.*, 29 Neb. 700, 715; *Craft* v. *McConoughy*, 79 Ill. 346, 350; *People ex rel. Peabody* v. *Chicago Gas Trust Co.*, 130 Ill. 268, 298; *Hawarden* v. *Y. & L. C. Co.*, 111 Wis. 545; *U. S.* v. *J. M. C. & C. Co.*, 46 Fed. Repr. 432.) In *People ex rel. Tyroler* v. *Warden, etc.* (157 N. Y. 116, 132) Parker, Ch. J., very properly said: "In this one (jurisdiction) it is well established that the public welfare is best subserved by the encouragement of competition."

It was held in the *Arnot* case that a contract by one producer with another to withhold his supply from the market was against public policy and void; in the *Curran* case that contracts or arrangements with employers, to coerce other men to join an organization, under the penalty of the loss of their positions, were against public policy, unlawful and in conflict with the principle of public policy which prohibits monopolies and exclusive privileges; and in the *Milk Exchange* case that a corporation to fix the price of milk justified a finding that the corporation was a combination, the purpose of which was inimical to trade, and, therefore, unlawful. In the *McMillin* case a combination was entered into for the management and control of the business of manufacturing carbon, by which several corporations combined, the proceeds to be divided in accordance with the contract, and

it was held illegal and void.   In the *Judd* case an agreement was made for the purpose of suppressing competition in the sale of sheep and lambs; and it was held contrary to public policy and void, and also that the fact that it was entered into for the purpose of protecting those interested from loss by unreasonable competition, made no difference ; that the agreement being intended to control the markets, it was invalid, as the public might be prejudiced thereby, and whether they were in fact was immaterial.   The *Blue Stone* case involved a contract by which nearly all that kind of stone was to be sold at prices to be fixed and uniform, the sales to be apportioned between the producers, and it was held that it was void in that it threatened a monoply whereby trade in a useful article might be restrained and its price unreasonably enhanced.   In the *Cohen* case there was an agreement between the manufacturers of eighty-five per cent of the envelopes manufactured in the country and an outside manufacturer, which provided that the selling price of all envelopes manufactured by them should be fixed by a corporate agent, and it was held that the combination threatened a monopoly whereby trade in a useful article might be restrained and, hence, it was invalid.   In the *Freight Association* case there was a contract between common carriers which resulted in increasing fare or freight beyond that which would exist if competition was free, and it was held invalid.   In Beach on Modern Contracts it is said : " Combinations among persons or corporations for the purpose of raising or controlling the prices of merchandise, or any of the necessaries of life, are monopolies, and intolerable, and ought to receive the condemnation of the courts.   Monopoly in trade or in any kind of business in this country is odious to our form of government.   It is sometimes permitted to aid the government in carrying on a great public enterprise or public work under governmental control, in the interest of the public.   But its tendency is destructive of free institutions and repugnant to the instincts of a free people, and contrary to the whole scope and spirit of the Federal constitution."   Thus we see

that agreements and acts injurious to trade or commerce, combinations to restrain competition in articles or commodities in common use, and monopolies restraining or preventing trade, have, by a long line of authorities, been held to be illegal.

This brings us to consider whether the *means* the association and its active members employed to accomplish their purpose were lawful. It will be remembered that the means adopted by them were that if any dealer or manufacturer sold goods to the plaintiff or any other person not conforming to the requirements of the association, all its active members were required to and refused to sell the goods of such manufacturer, procured others to refuse to deal in his goods, publicly advertised him as an unworthy dealer, and thus sought to injure and ruin his business. Thus it was that the members of the association accomplished their purpose of preventing other manufacturers from selling goods to the plaintiff. Such means were clearly unlawful. (*Temperton* v. *Russell,* L. R. [1 Q. B. D. 1893] 715; *Rourke* v. *Elk Drug Co.,* 75 App. Div. 145; *People* v. *Fisher,* 14 Wend. 9, 14; *People* v. *N. R. S. R. Co.,* 54 Hun, 354; affirmed, 121 N. Y. 582; *O. D. Steamship Co.* v. *McKenna,* 30 Fed. Repr. 48; *Casey* v. *Cincinnati Typographical Union,* 45 Fed. Repr. 135, 146; *Boutwell* v. *Marr,* 71 Vt. 1, 7; *Doremus* v. *Hennessy,* 176 Ill. 608, 614; *Brown* v. *Jacobs Pharmacy Co.,* 57 L. R. A. 547.)

In *Temperton* v. *Russell* a firm of builders refused to obey certain rules of the trade unions with regard to building operations, and the unions sought to compel them to do so by preventing the supply to them of building materials, In furtherance of this purpose they requested the plaintiff who supplied building materials to the firm, to cease supplying them, which he refused to do. Thereupon, with the object of injuring the plaintiff in his business, in order to compel him to comply with such request, the defendants induced persons who had entered into contracts with him for the supply of materials to break their contracts, and not to

enter into further contracts with the plaintiff, by threatening that the workmen would be withdrawn from their employ. The plaintiff sustained damage by reason thereof, and the court held that an action was maintainable by the plaintiff against the defendants for maliciously procuring such breaches of contract, and for maliciously conspiring together to injure him by preventing persons from entering into contracts with him.    In the *Fisher* case Savage, Ch. J., in effect said that the owner of an article was not required to sell it for any particular price, or for less than a stated price, but he had no right to state the price at which others should sell their goods, and that all combinations to effect such a purpose were illegal. In the *McKenna* and *Casey* cases it was held that all associations designed to interfere with the management and control of lawful business, or in dictating the particular terms upon which its owners should conduct it, by means of threats of injury or loss, by interfering with their property or traffic, or with their lawful employment of other persons, are *pro tanto* illegal combinations or associations.    The same principle was involved in the case of *Curran* v. *Galen* (*supra*).

In the *Boutwell* case it was said : "Without undertaking to designate with precision the lawful limit of organized effort, it may safely be affirmed that when the will of the majority of an organized body, in matters involving the rights of outside parties, is enforced upon its members by means of fines and penalties, the situation is essentially the same as when unity of action is secured among unorganized individuals by threats or intimidation.    The withdrawal of patronage by concerted action, if legal in itself, becomes illegal when the concert of action is procured by coercion."

In *Doremus* v. *Hennessy* it was said : "No persons, individually or by combination, have the right to directly or indirectly interfere or disturb another in his lawful business or occupation, or to threaten to do so, for the sake of compelling him to do some act which, in his judgment, his own interest does not require.    Losses willfully caused by another, from motives of malice, to one who seeks to exercise and enjoy the

fruits and advantages of his own enterprise, industry, skill and credit, will sustain an action.   *   *   *   Malice, as here used, does not merely mean an intent to harm, but means an intent to do a wrongful harm and injury.   An intent to do a wrongful harm and injury is unlawful, and if a wrongful act is done to the detriment of the right of another it is malicious, and an act maliciously done, with the intent and purpose of injuring another, is not lawful competition."

In *Brown* v. *Jacobs Pharmacy Co.* it was said : "Suppose that a number of merchants should agree to fix the price of certain goods, and not to sell below that price ; if there were no statute on the subject, and the case rested on the common law, the agreement would simply be non-enforceable; but if they went further, and agreed that, if any other merchant sold at a less price, they would force him to their terms, or drive away those dealing with him, by violence, threats or boycotting, it would cease to be a mere non-enforceable contract, and if, in its execution, damages proximately resulted to such other merchant, he would have a right of action.

Before concluding this discussion, there is another aspect of the situation which seems worthy of consideration, or of mention, at least.   If the decision of the court below shall be affirmed, it obviously results in an unfair and unjust discrimination by this court in favor of capital or business and against labor, by enforcing the law as to one and refusing as to the other.   As we have already seen, this court, in *Curran* v. *Galen,* unanimously held that a combination or association of workingmen whose purpose was to hamper or restrict the freedom of the citizen in pursuing his lawful trade or calling, through contracts or arrangements with employers to coerce workingmen to become members of the organization and to come under its rules and conditions under penalty of loss of their positions and of deprivation of employment, was against public policy and unlawful ; while in this case it is held that a combination or asssociation of wholesale dealers in useful articles whose purpose is to hamper and destroy the freedom of the plaintiff and others to pursue their lawful business, by

contracts or arrangements with manufacturers to coerce them to become members of their organization and to come under its rules and conditions under penalty of the destruction of their business, was not against public policy nor unlawful. As these decisions could not be harmonized, they would result in a discrimination in favor of capital or business which could not be sustained upon any just or legal principle known to or established by statute or common law. With the existing conflict between capital and. labor, such a distinction would not only be unjust, but extremely unfortunate, especially as it can be justified upon no principle of ethics; law or equity.

Thus far we have discussed the illegality of contracts involving the creation of monopolies, agreements that prevent competition, and the right of individuals or corporations, by threats, intimidation, or interfering with the business or traffic of others, to enforce or compel parties to enter into contracts in restraint of trade, under the general principles of the common law and the statutes and upon the broad ground that they apply to all lawful contracts or business, subject to very slight limitations. We have regarded the principle of the cases cited and the provisions of the statute as sufficiently broad to apply to all transactions relating to trade and commerce, to the free pursuit of any lawful business, trade or occupation, and to the sale of any article or commodity in common use. The learned court at Special Term, however, seems to have emphasized and placed great reliance upon the fact that the articles to which this controversy relates were not the prime necessaries of life, or articles which were necessary to the existence of man, and also upon the ground that as they were patent medicines each owner possessed a greater right as to their disposition than he otherwise would, including their sale free from competition among dealers to whom they were sold, while the learned Appellate Division seems to have based its decision upon the ground that patent medicines are not necessaries of life as to which public policy might restrain a combination to fix an exorbitant price.

Obviously the provisions of the statutes and the principles of the decisions to which we have referred are not limited in their application to the necessaries of life, but, as we have already seen, they have a much broader application and include all articles and commodities in common use or that are the subject of lawful trade or commerce. In determining whether there has been a conspiracy in restraint of trade, the character of the trade sought to be monopolized is immaterial so long as it is a lawful one. (*People* v. *Duke*, 19 Misc. Rep. 292, 296; 78 N. Y. S. R. 336.) Nor is the operation of the rule forbidding contracts restraining competition limited to trade in necessaries of life, but extends equally and alike to all commodities of commerce. (*Wire Cloth Case*, 19 N. Y. Supp. 413, note.) It is apparent from the character of this litigation that the articles and commodities to which it relates are both articles of trade and commerce and such as are in common use. This is obvious when we consider the fact that they amount annually to about sixty million dollars and constitute more than two-thirds of all the drugs and medicines sold in the United States. Therefore, the fact that they may not be necessaries of life in the strictest sense, is not controlling, and the decision of the courts below cannot be sustained upon that ground.

Moreover, the fact that the medicines may have been patented or copyrighted, so as to give the owners the exclusive right of sale, can make no difference. It must be constantly borne in mind that the purpose of this action is not to compel the manufacturers, against their will or disposition, to sell their goods to the plaintiff, but its purpose is to enjoin the association, its active members, committees and agents, from compelling manufacturers or dealers, against their will, to refuse to sell their property to the plaintiff by a system of intimidation and boycotting. It is not and cannot be properly claimed that the plaintiff can compel the manufacturers to sell it their merchandise without their consent or against their will, and the fact that it consists of proprietary articles or patent medicines can make no difference whatever. With

few exceptions, which have no application here, courts can compel no owner of property to sell or part with his title to it without his consent, or to sell or deliver it to any particular person. So that the rule is the same where a party is the exclusive owner of the property, whether it is patented or not. at least so far as the question here involved is concerned. Besides, there are authorities which hold that patentees or owners of patents cannot legally enter into a combination in restraint of trade, or for the creation of monopolies in the sale of their goods, and that such contracts are unlawful. It is said : "Patents confer a monopoly as respects the property covered by them, but they confer no right upon the owners of several distinct patents to combine for the purpose of restraining competition and trade. Patented property does not differ in this respect from any other." (*National Harrow Co.* v. *Hench,* 83 Fed. Repr. 36, 38 ; 76 Fed. Repr. 667 ; *Parke & Co.* v. *Druggists' Assn.,* 84 N. Y. S. R. 1064 ; *Vulcan Powder Co.* v. *Hercules Powder Co.,* 96 Cal. 510, 515 ; *National Harrow Co.* v. *Bement & Sons,* 21 App. Div. 290 ; Beach on Monopolies and Industrial Trusts, § 175 ; Tiedeman on State and Federal Control of Persons and Property, vol. 1, 412.)

If, however, it were conceded that the possession of their patents authorized the manufacturers to enter into combinations which otherwise would be illegal, still, that principle would have no application whatever to this case. Here it is not the manufacturers or the patentees who have organized the combination complained of, or who have sought to create a monopoly and prevent competition. The patentees have not forced, or attempted to force, the wholesale druggists to transact their business in any particular manner. But it is the wholesale druggists' association, organized and controlled by the druggists, who have no special property or interest under the manufacturers' patents, who seek to and have enthralled the patentees themselves and such of their customers as will not bow in subjection to a method of transacting their own business, inaugurated and enforced by the

association.   In other words, the plaintiff desires relief, not
from the voluntary act of the patentees or from any combina-
tion into which they have voluntarily entered or which they
control, but asks to be relieved from a combination of their
customers who have by threats and intimidation compelled
them, notwithstanding their desire to do so, to refrain from
selling their property to the plaintiff or other customers with-
out the consent of the association.

Hence, by the allegations of the complaint, it is made
apparent, not only that the defendants entered into and
formed an illegal combination or conspiracy to interfere with
the plaintiff's trade by preventing the various manufacturers
of these goods from selling them to it and thereby seriously
interfered with and injured its business, but it is equally
clear that the means employed by them to accomplish that
purpose, by threats, intimidation, boycotting and continued
and persistent efforts to injure any manufacturer who should
continue to deal with it, were also illegal.   Therefore, the
defendants were not only guilty of an illegal act in combining
to injure the plaintiff's business, but were likewise guilty of
an illegal combination to accomplish the plaintiff's ruin by
illegal and improper means.   The purpose being illegal and
the means by which it was accomplished being also illegal, it
follows that the action of the defendants was illegal and, as
against the plaintiff, should be restrained.   These considera-
tions lead to the conclusion that the facts alleged in the
amended complaint and admitted by the demurrer were suffi-
cient to constitute a cause of action, and that the courts below
erred in holding to the contrary and in dismissing the
complaint.

It follows that the final and interlocutory judgments herein
and the order dissolving the preliminary injunction should be
reversed, the demurrer to the complaint overruled, with costs
in all the courts, but with leave to the defendants, upon the
payment of one bill of costs, within twenty days, to file and
serve an answer to the amended complaint herein.

CULLEN, J. (dissenting). I concur in the opinion of MARTIN, J., for reversal, but I wish to add a word as to my position on a question discussed in the opinion of Judge HAIGHT. I agree with him that the combination between the jobbers to force the manufacturers to sell to each of their number at exactly the same price and upon the same terms and to sell to no one else on any better terms was entirely legal, and that it was within their rights to accomplish this result by refusing to deal with or handle the goods of any manufacturer who would not comply with their demand. If the object of the combination ceased here, it would not be subject to criticism. But the scheme adopted goes further. It requires the manufacturer not only to sell at the same price to each jobber, but to compel each jobber to sell to the consumer at the same price by refusing to sell goods to any one who would not comply with these requirements. It is in this respect that the agreement is vicious and operates in restraint of trade, for it destroys competition among the jobbers.

O'BRIEN and BARTLETT, JJ., concur with HAIGHT, J., and PARKER, Ch. J.; VANN, J., concurs with MARTIN and CULLEN, JJ.

Judgment affirmed.