OLMSTEAD et al. v. DISTILLING & CATTLE–FEEDING CO. GRAVES
v. SAME. BAYER v. SAME.

(Circuit Court, N. D. Illinois, N. D.   December 3, 1896.)

**1. CONTRACTS—ILLEGAL CONDITION—"REBATE VOUCHERS."**
   The D. Co., which manufactured and sold spirits, etc., issued to the pur-
   chasers of its goods so-called "rebate vouchers," by which, "for the purpose
   of securing the continuous patronage" of the customer, it promised to pay him,
   in six months, a sum equal to five cents per gallon of the goods purchased by
   him; such voucher providing that it should "be valid and payable only on
   condition" that the purchaser and his successors should, during such six
   months, have bought all his supply of such goods from the D. Co., or certain
   persons named as its distributing agents. The D. Co. having been placed in
   the hands of a receiver, certain of these vouchers were presented to him for
   allowance, by persons who claimed to hold them as equitable assignees from
   the persons to whom they were issued. It appeared that the condition as to
   continued purchases from the D. Co. had not been complied with. *Held*, that
   such vouchers did not create a present obligation to pay the rebate, subject to
   be defeated by a breach of the condition, but that such obligation would arise
   only on performance of the condition, and accordingly that, even if the condi-
   tion were held to be illegal, there would be no obligation without performance.

**2. SAME—ILLEGAL CONSIDERATION.**
   *Held*, further, that the rebate did not appear from the contract to be a sum
   in excess of the price of the goods sold, and that it could not be recovered back
   as money of the customer paid on an illegal consideration, and held by the D.
   Co.

**3. SAME—INTERPRETATION.**
   *Held*, further, that no engagement could be implied that the D. Co.'s products
   should be offered during the six months at reasonable prices, or without further
   rebate vouchers, conditioned on still further patronage.

**4. SAME—PUBLIC POLICY.**
   *Held*, further, that such rebate vouchers were not illegal or against public
   policy.

Exceptions to the report of a special master disallowing certain
claims on rebate vouchers against the property in the hands of the
receiver of the Distilling & Cattle-Feeding Company.

Moses Solomon, for the exceptors.
Herrick, Allen & Boyesen, for the receiver.
Moran, Kraus & Mayer, for Distilling & Cattle-Feeding Co.

SHOWALTER, Circuit Judge.   Of the rebate vouchers here in
question (being 148 in number, and aggregating $8,702.87), 47, orig-
inally issued to a firm doing business under the name of Stein Bros.,
were transferred by Stein Bros. "without recourse," to Wolf. Wolf
afterwards alienated his interest therein, and the 47 vouchers are
now held by Moses Solomon, claimant and exceptor here. The re-
maining 91 vouchers, originally issued to a corporation called Charles
Dennehy & Co., were also assigned. The corporation, Charles Den-
nehy & Co., asserts here no right on its own behalf. Its name is here
made use of in the interest of one G. F. Jones, who claims to hold
the 91 vouchers by assignment from the United States Distilling
Company, the concern to which the vouchers were transferred by the
said Charles Dennehy & Co. Jones is really the other claimant and
exceptor here, though the name "Dennehy & Co." is made use of by
him. Besides the 47 original vouchers, Solomon offered in evidence
certain transcripts of judgments on said vouchers rendered by jus-

tices of the peace in Cook county, Ill. These transcripts were from the files of the circuit court of Cook county. Appeals from said judgments had been duly perfected, and the causes were undisposed of in the circuit court. By these appeals the judgments of the justices had become inconclusive of the matters in dispute. Upon an appeal from a justice of the peace in Illinois, a trial de novo is had in the circuit court. The case was not different to what it would have been if original suits had been commenced, and remained undisposed of, in the circuit court. It was not error in the master to exclude these transcripts. The claim of Solomon, as does that of Jones, rests upon the vouchers assigned to him—equitably, at least, as he insists—in the manner already mentioned. These 148 vouchers are alike, except in figures, dates, and amounts. A specimen is in words following:

"No. 837. Peoria, Ill., Oct. 22, 1891.

"Subject to the conditions named herein, and for the purpose of securing the continuous patronage of the within-named purchaser, and successors and assigns of the same, for its products, the Distilling and Cattle-Feeding Company, six months from the date of this purchase voucher, will pay to Stein Bros., of Chicago, Illinois, purchaser, sixteen and forty-seven hundreds dollars ($16.47), being a rebate of 5 cents per proof gallon on 329½ proof gallons of the Distilling and Cattle-Feeding Company's product purchased this day. This voucher will be valid and payable only on condition that the above-named purchaser, the successors and assigns of the same, from the date of this voucher to the time of its payment, shall have bought their supply of such kind of goods as are produced by the Distilling and Cattle-Feeding Company, and all compounds thereof, exclusively from one or more of the dealers named on the back hereof, until further notified, and shall also have subscribed to the certificate on the back hereof.

"[Signed] Distilling and Cattle-Feeding Company,
"By J. B. Greenhut, President."

Indorsed on this was the certificate to be subscribed by the voucher holder, and the list of dealers or distributers. No one of the certificates was subscribed. Stein Bros. did not, during the six months following October 22, 1891, buy their supply from the Distilling & Cattle-Feeding Company's distributers, as proposed; nor was the condition as to the six-months future patronage fulfilled as to any one of the 148 vouchers. Can the $16.47 mentioned in the voucher above set out, or the sum mentioned in any one of the 148 vouchers, be recovered? Counsel for the exceptors treat the foregoing document as a present obligation for the $16.47, to be defeated in case Stein Bros. do not, during the six months, buy their supply from the Distilling & Cattle-Feeding Company, or some one or more of the dealers indicated. The condition, they say, is illegal, as being in restraint of trade, or against the federal or state statute in that behalf. The obligation to pay the $16.47 is therefore, as they contend, left valid and indefeasible. On the contrary, as appears from the language made use of in the instrument, the obligation arises—the voucher becomes valid and payable—only in case, at the end of the six months, Stein Bros. shall have bought their supply from some one or more of the dealers indicated. If the condition be illegal and void, obviously the voucher fails entirely. In that case there can be no obligation on the voucher to pay anything, and the action, so far as it rests on the promise in that instrument, necessarily fails.

Greenh. Pub. Pol. rule 24. Out of the idea that an obligation to pay the $16.47 named in the voucher of October 22, 1891, was to be defeated in case, during the six months, Stein Bros. bought any portion of their supply from some dealer not a distributer of the Distilling & Cattle-Feeding Company, apparently arises the contention that the $16.47 was a sum in excess of the price of the 329½ gallons then purchased by Stein Bros.; that, the condition being void as against public policy or the federal or state statute on trade restraint, the $16.47 was in fact the money of Stein Bros. in the hands of the company without consideration and as a pledge or hostage to secure an unlawful purpose, and that Solomon, being assignee, in equity, is entitled to recover this deposit. A court may refuse to enforce a written agreement or promise, for illegality in the consideration, or on grounds of public policy, but the writing does not thereby become any the less the evidence of what the agreement or promise was. For the money paid by Stein Bros. on October 22, 1891, they received the 329½ gallons, and the promise of the company to pay them $16.47 in a certain contingency, and at the end of six months. If it did not appear, when the time expired, that Stein Bros. had, during that period, bought their entire supply from some one or more of the company's distributers, there would be no obligation to pay the $16.47. In such case the sum paid by Stein Bros. on October 22, 1891, would, within the obvious intent of the parties, remain the price and equivalent for the 329½ gallons then delivered. The $16.47 was not, therefore, money of Stein Bros. in the hands of the company. The rule, if there be such a rule, that one who advances money on an executory illegal agreement may repent and recovery back his advance before the illegal purpose has been accomplished, does not apply. If Stein Bros. saw fit to fulfill a certain condition in which the company deemed itself interested, they were to receive the $16.47. Failing the performance of that condition, whether legal or illegal, there was no engagement to pay them anything.

Assuming that the voucher is not illegal, as in restraint of trade, or against the terms of any statute on that subject, it is argued that the Distilling & Cattle-Feeding Company impliedly engaged—in the voucher of October 22, 1891, for instance—that, during the six months following, its product would be offered for sale to Stein Bros. at a "reasonable price," and without any further rebate voucher conditioned on still further patronage. This contention evidently goes on the impression that such an implied term is wanted, and may be supplied, in order to give to the voucher the consistency of a contract,—in order to prevent it from being nudum pactum. If A., as part of an agreement whereby he sells to B. a certain property, stipulate with B. to pay him back a specified percentage of the price, in case, at the end of six months, B. shall have bought of A. a certain other property, such stipulation, it seems to me, would amount to nothing. A., being unrestricted, could at his pleasure, in the proposed future deal, fix his price so that it would be an equivalent for the property plus the back payment. Yet, if B. actually made the purchase within the time, the price paid by

him would, as between the parties, be the consideration for the property then bought, and there would be no consideration for A.'s promise to make the back payment. If B. should insist that such promise was part of the consideration to him for the price paid in the original transaction, he would be met with the suggestion that A.'s promise was of no worth, since A. remained at liberty to fix his own price in the proposed sale, wherefore the sole and only consideration for the price paid on the original transaction was the property then delivered. If, however, the proposed sale involved some restriction on A.'s liberty to fix the price, if the price at which B. might buy was to conform to prices such as A. should then be receiving for property of the same kind in the market, or if the price was to be fixed by a third person, then the promise of A. might mean something. That promise, in connection with the restriction on A.'s liberty to control the price, together with the property transferred, might be deemed the consideration for which, in the original transaction, B. paid his money. But, on the case as first put, I do not understand that a "reasonable price" can be implied in order that an obligation may arise out of terms which of themselves would create no obligation.

The Distilling & Cattle-Feeding Company sold its product to the concerns named on the back of the voucher above shown. These concerns were called the company's "distributers." As part of the terms of any sale to one of its distributers, the company promised such distributer a rebate of two cents per gallon on the quantity bought, to be credited at the end of five months, in case, during the interval, such distributer bought his entire supply from the company. As a term in any sale to a distributer, the company also authorized him to promise the buyer, in any sale by him of the company's product, a rebate voucher like that set out above. The company fixed its own price to these distributers. This price was the same to all for the time being. There is no showing that Stein Bros. and Dennehy & Co. could not, in fact, have obtained their entire supply from the distributers of the company, without discrimination, and on the same terms as other buyers from the company's distributers. It does not appear, however, that the company, by stipulation with its distributers, controlled the prices at which they were at liberty to sell, further than as here indicated. Under the system in which all were involved, the distributers would voluntarily make the same prices to all buyers, and, so far as appears, this was the effect. But at times the prices thus paid by buyers from the distributers was higher, after deducting the rebates conditionally payable to such buyers, than the prices at the same times, and for the time being, charged by manufacturers competing with the Distilling & Cattle-Feeding Company. By the voucher of October 22, 1891, for instance, if Stein Bros. bought their entire supply for the next six months, not from the company, but from some one or more of its distributers, then the company would pay the $16.47. The company would raise or lower its prices to its distributers as it saw fit, but such changes in price would be uniform. The terms of any sale to Stein Bros. were to be made or

concurred in by the distributer. To this extent the company had parted with its control over the prices at which Stein Bros. must buy in order to get the $16.47. I am confident that there is not in the voucher, by implication, any engagement by, or restriction on, the company, to the effect that its product should be offered to Stein Bros. at a price which some disinterested third party might deem "reasonable," or which might be the same as that for the time being charged by other manufacturers. As part of the consideration to the distributer in a sale to him of its goods, the company authorized him to promise its rebate voucher to any buyer from him, as a term in any sale by him of the company's product to such buyer. This method or custom of business was fully understood by Stein Bros. and Dennehy & Co. There is no implication that the price to Stein Bros. during the six months following October 22, 1891, was to be without reference to any further rebate conditioned on future patronage. Stein Bros. were not bound to buy from the company's distributers during the six months which followed October 22, 1891; but, if they did, the tender, as a term in the sale contract, of a further rebate voucher, conditioned on future patronage, was not excluded by implication.

In Mogul S. S. Co. v. McGregor [1892] App. Cas. 25, the owners of certain lines of steamships, in order to secure the exclusive carrying trade in tea "and general cargo" from a certain port in China, combined in an agreement whereby a rebate of 5 per cent. from freight rates uniform as between the members of the combination, was to be paid or allowed at the end of each six months to each exporter who shipped during the preceding half-yearly interval only by some vessel belonging to a member of the combination. Plaintiff, a vessel owner not in the combination, was, as the result, excluded from the trade. He thereby lost shipments and profits which would otherwise have accrued to him; but it was ruled—first by Lord Coleridge (21 Q. B. Div. 544), then on appeal (23 Q. B. Div. 598), then on further appeal to the house of lords—that he had no cause of action. The judges said that the conduct of the defendants was predicated on legitimate self-interest, and that no right of plaintiff had been invaded. The purpose of defendants, by their rebate system, was to break down competition, meaning thereafter to raise their freight rates. If in that case the defendants, instead of being a combination, had been a single concern or corporation, the result would obviously not have been more favorable to plaintiff. The Distilling & Cattle-Feeding Company was a corporation dealing with its own product. By its rebate system it sought—unsuccessfully, as the evidence shows—to retain its patronage against competing manufacturers, without letting down its prices. The rebate to buyers from its distributers was an allowance from an agreed price, conditioned, as in the Mogul S. S. Case, on an exclusive future patronage of six months duration. In the Mogul Case the rebate was promised by the members of the combination directly to the exporter. Here, the distributer, as a term in his contract for goods with the Distilling & Cattle-Feeding Company, was licensed to promise a buyer from him, in his sale to such buyer, the company's rebate voucher. Could

the rights of an exporter in the former case, any more than of a competing carrier, have been trespassed upon? If not, upon what theory were the rights of a buyer such as Stein Bros. or Dennehy & Co., invaded by the rebate system here in question? In Re Greene, 52 Fed. 104, 119, Judge Jackson, in considering the rebate vouchers of the Distilling & Cattle-Feeding Company, cited the Mogul Case with approval, and declared that such vouchers were not illegal, and not against public policy, as being in restraint of trade. In the Greene Case the federal statute "to protect trade and commerce against unlawful restraint and monopoly" was in question. The Illinois statute of 1891 on "pools, trusts and combines" has no bearing, so far as I can see, on any question here. Upon the evidence in this record, the Distilling & Cattle-Feeding Company never had a monopoly in distillery products. The rebate system, as practiced by that company, did not, in fact, tend to give it a monopoly.

Much has been said in the argument on the point that the Distilling & Cattle-Feeding Company had bought a very large percentage of all the distilleries in the United States. If it were unlawful (see the Case of Greene, above cited) for the company to buy a portion of, or even all, the distilleries in the country, no attempt has been made to show special damage to Stein Bros. or Dennehy & Co., as resulting from such unlawful ownership, or in any way from the operations of the company. Nor do I see how any action for damages arising out of an attempt by the company to secure a monopoly, by buying distilleries or otherwise, would pass to Solomon or Jones in an equitable transfer to them of rebate vouchers. Such a complaint would be collateral to, or apart from, each contract in which a rebate voucher was issued and accepted. National Distilling Co. v. Cream City Importing Co., 86 Wis. 352, 56 N. W. 864.

For a time, Stein Bros. bought the Distilling & Cattle-Feeding Company's product, accepting a rebate voucher at each purchase. But before they had extended exclusive patronage as proposed in the voucher, for a period of six months from the date of any voucher, Wolf, representing a distilling concern in competition with the Distilling & Cattle-Feeding Company, in order to get the business of Stein Bros. for his principal, paid Stein Bros. a sum equivalent to the total of the sums mentioned in the 47 rebate vouchers. Stein Bros. thereupon wrote and subscribed with their firm name the words "Without recourse" on the back of each voucher, and gave the entire lot to Wolf. Dennehy & Co., being indebted to the United States Distilling Company, assigned or sold whatever interest Dennehy & Co. had in the 91 vouchers to the United States Distilling Company, also "without recourse," and received therefor a credit to the full extent of the face value of said vouchers. Dennehy & Co., as already said, had not complied with the condition in any one of these vouchers; but the United States Distilling Company took them with notice of this, and upon the idea that a recovery might be had without such compliance, or that they could be used in compromise negotiations as against a debt from the United States Distilling Company to the Distilling & Cattle-Feeding Company. These claimants, Solomon and Jones, appear here as owners, by

equitable assignment, of the 148 vouchers. I do not see how either can assert any claim, except such as would arise upon the vouchers themselves. Since the condition was not fulfilled in the case of any voucher, I think there can be no recovery. The exceptions to the master's report are overruled.