# CIRCUIT COURTS OF ILLINOIS.

*(Circuit Court of Cook County. In Chancery.)*

## Isaac Platt

### vs.

## National Association of Retail Druggists, Thomas W. Wooten, Fuller & Fuller Company, et al.

(Jan. 24, 1905.)

1. CONTRACTS—RESTRAINT OF TRADE—FIXING RETAIL PRICE. Contracts between manufacturers of proprietary medicines and wholesale dealers fixing the price at which such medicines shall be sold by the wholesale dealers to retail dealers, and by which the wholesale dealers agree not to sell such medicines to such retail dealers as are placed upon a list by the manufacturers (such list comprising the names of those dealers who sell the proprietary medicines at less than the regular retail prices) are not in unlawful restraint of trade and competition.

2. INJUNCTION—CONTRACTS IN RESTRAINT OF TRADE—COMPLAINANT'S REMEDY. Where a person is not a party to a contract in restraint of trade, he has no standing to call upon a court of equity to interfere. The remedies imposed by the legislature for violations of the anti-trust laws ought to be pursued, and where the matter is not the construction or the enforcement of a contract between the parties who appear in the court, a court of equity ought not to take jurisdiction.

3. INJUNCTION TO COMPEL COURSE OF DEALING WILL NOT LIE. There is no way in which a court of equity can make one man trade with another. If a merchant puts himself in a position where he holds himself out to sell to everybody on the same terms, it may be that an action at law will lie against the merchant for any damages that a party may sustain to whom he refuses to sell, but there is no method of proceeding in equity to make that merchant sell to that individual unless he wants to. He may refuse to trade with him from mere caprice.

4. COURTS OF EQUITY—SUPERVISORY POWER OF. A court of equity cannot undertake to supervise the entire wholesale drug trade in

1

a city and see that the wholesalers sell goods to complainant or any one else.

5. TEMPORARY INJUNCTION—WHAT THE COURT WILL CONSIDER IN GRANTING. The court, in granting an application for a temporary injunction, must always look upon what may be called the balance of equity or of damages.

6. The complainant was a dealer in patent or proprietary medicines some of which he sold at "cut" or less than the regular prices. Manufacturers of these proprietary medicines had entered into contracts with wholesale druggists binding the wholesalers not to sell the medicines except at a prescribed scale of prices, and not to sell to retail dealers who cut the regular prices on such medicines. Complainant's name was placed on the list of retailers to whom the wholesalers were forbidden to sell such patent medicines, and as a result he was unable to purchase these medicines from the wholesalers. Complainant applied for an injunction against certain of the wholesale druggists of Chicago, the National Association of Retail Druggists, and others, enjoining any discrimination on the part of the wholesale merchants against him in the purchase of any of those medicines that he may offer to buy at current prices, the same prices paid by others, and also enjoining the National Association of Retail Druggists from "blacklisting" him as an "unfair" druggist who cuts rates, and to whom none of these proprietary medicines is to be sold because of his practice of selling below the fixed price. *Held* that a temporary injunction could not be granted.

Bill for injunction, Circuit Court Cook County, Chancery Gen. No. 258,958. Heard before HON. MURRAY F. TULEY, upon bill and answer, with affidavits in support of each.

For statement of facts see opinion.

*A. E. Gammage,* for complainant.

*Holt, Wheeler & Sidley, Pease, Smietanka & Pease, Steele & Thompson, J. M. Errant* and *C. Lane,* for defendants.

TULEY, J. (orally) :—

I have not been able to give to this case that mature consideration that I would have desired to give in a matter of such great importance. I realize the importance of the matter now pending.

The bill is brought by Isaac Platt of Chicago, a retail druggist, alleging, in substance, that for ten years and more

he has been a druggist in the city of Chicago carrying on his business. Without going into the details of the bill, which is quite lengthy, I will state the substance of the bill as to the matters and points in controversy.

He alleges that it is necessary for the successful carrying on of his business that he should purchase and keep on hand certain medicines, known as proprietary medicines, such as "Peruna," "Pierce's"—different medicines manufactured and sold from Buffalo, "Miles' Remedies," the preparation of which is based on what are known as "trade secrets."

He alleges, in substance, a conspiracy between the National Association of Retail Druggists and the defendants, who are wholesale druggists in the city of Chicago, and the manufacturers of these proprietary medicines, to prevent his purchasing and selling these proprietary medicines and other medicines; a conspiracy to deprive him of the right to keep such medicines in stock, buy them in the open market and sell them to his customers at whatever price he thinks proper to sell them.

He seeks an injunction against the wholesale merchants, the National Association of Retail Druggists and others, enjoining any discrimination on the part of the wholesale merchants against him in the purchase of any of those medicines that he may offer to buy at the current prices, the same prices paid by others, and also against the National Association of Retail Druggists from "blacklisting" him, as an "unfair druggist" who cuts rates, and to whom none of these proprietary medicines are to be sold, because of his practice of selling below the fixed price.

In substance, he asks a mandatory injunction commanding (in effect) the wholesale druggists of this city to sell him these medicines at current prices.

It is sufficient to state that the defendants come in and by their answers deny all conspiracy, combination or collusion.

The facts in this case are substantially undisputed; it is a question entirely of law.

The facts appear to be that the National Association of Retail Druggists recommended—and it may be said that the

evidence tends to show that they are acting upon an understanding, if not in collusion with the proprietors of these medicines,—to put in force in the trade what has come to be known as the direct contract and serial number plan of operations.

The direct contract plan appears to have had its origin in England, and a case is reported as far back as the 2nd Chancery Reports, *Elliman v. Carrington* ([1901] 2 Ch. 275), which I believe arose in regard to a certain secret preparation, a medicine, both for horse and man.

It was afterwards adopted in Canada by what is known as the Liquid Ozone Company, manufacturing liquid ozone by a secret process, and was subsequently adopted in this country by the National Association of Retail Druggists and manufacturers of certain proprietary medicines.

The plan is simply a contract plan, and consists in this: The manufacturer of the medicine gives notice to the world that he will only sell to wholesale merchants and jobbers upon a condition that they enter into a contract with him or with his company, by which the wholesale merchant is appointed a distributing agent of the proprietor of the medicine. He is termed an agent, but it is in reality a sale and must be so treated and considered.

The form of the contract prescribed by the manufacturer is set out in one of the answers, and probably will give a better idea of it than any statement I might make, namely, the answer of Fuller & Fuller. That sets out the contract, which is in duplicate, and purports to be an agreement made the blank day of blank, between the "World's Dispensary Medical Association of Buffalo" (which sells quite a number of these medicines, I believe Pierce's medicines), "and the Fuller & Fuller Company," who, in the contract, are termed "the undersigned." The World Dispensary Medical Association appoints the undersigned as one of its "wholesale distributing agents for its proprietary remedies, the undersigned agreeing to distribute the said remedies on the terms and conditions following:"

"The undersigned agrees to refrain from selling said As-

sociations' preparations at any price, either directly or indirectly, to any individual, firm or corporation, whom the said Association may, by written or printed notice, duly stamped and mailed to the undersigned, designate as not entitled to deal in its proprietary medicines. The sale of the World's Dispensary Medical Association preparations must be confined to legitimate retail dealers in proprietary medicines in good standing, and the undersigned agrees in case he, or any agent or employe shall wilfully violate any of the provisions of this contract, on proof of such violation he will pay the sum of $50 as liquidated damages; he must allow no greater discount than is rulable in the section of the country where the sale is made. And

"In consideration of the granting to the undersigned by the World's Dispensary Medical Association * * * the above rebates and conditions in the distribution of the several preparations of its manufacture, and of the appointment of the undersigned as one of the wholesale distributing agencies of said Association," agrees "not to distribute or deliver or allow to be delivered, directly or indirectly, any of the preparations manufactured by the World's Dispensary Medical Association, and delivered to the undersigned by said Association below the prices fixed and established in the following." Then follows a list of prices for Pierce's Golden Medical Discovery, Pierce's Favorite Prescription, Pierce's Pleasant Pellets and so on, some eight or ten of them.

The proprietor, or I think probably the National Association of Retail Druggists, aids in the expense of sending a notice to the wholesale merchants monthly, containing the names of all persons who have cut rates upon the medicines supplied them. The proprietor has, upon his medicine, a fixed price, say, for instance, of $1.00 per bottle, and any one found selling at a less price is put upon what might be termed the "blacklist" or "list of unfair purchasers." The wholesale merchant is notified not to sell to such parties; if he does, then the contract between him and the proprietor is annulled, all medicines they make, are withdrawn from him, and he cannot procure them upon any terms whatever.

Mr. Platt, the complainant in this case, it appears, sold these medicines at cut rates, and along in the year 1902 he commenced a similar suit to the present in this court, which was heard before Judge Dunne, seeking an injunction against the wholesale merchants refusing to sell him goods, they having refused because he sold at cut rates, and because they had been notified that they were not authorized to sell him these goods by the proprietor, the manufacturer of the medicine. A temporary injunction was issued—I think it issued without notice, but I am not sure, it is immaterial, however. For some time the injunction was respected and he succeeded in procuring his supplies.

Last fall, or in the beginning of December, it appears that he was refused any more medicines by different wholesale merchants, on the ground that his name appeared as an unfair purchaser and they were prohibited by their contracts from selling him any medicines of those particular makes. Thereupon he filed this bill.

I would state that the suit commenced before Judge Dunne, by mutual agreement or some understanding arrived at between the parties, was dismissed, the understanding of Mr. Platt being and it being acted upon largely, that he could have his medicines the same as any other retail druggist and he did procure them until this last fall when they commenced to refuse him and finally all of them did refuse to sell him these medicines at the current rates or at any price.

The wholesale merchants set up this contract, and they say, in substance, we need these medicines in carrying on our businesses, they are necessary for the successful supplying of our customers with what they desire. We can only get them upon the condition that we shall only sell to such persons as the proprietor designates, or at least we shall not sell to those to whom he says no sale is to be made, and also on the condition that all retail druggists that we sell to shall obligate themselves to maintain the prices marked upon the goods, that is, the current price, for instance, a dollar a bottle.

One of the wholesale merchants did violate this contract and the consequence was that he was notified that if he continued to sell Mr. Platt medicine, that the distributing or the agency for these medicines would be withdrawn from him and he could not obtain them upon any terms whatever. He was obliged then to say to Mr. Platt that he could no longer make a sale to him.

It is contended, on behalf of the complainant, that this arrangement between the proprietor and the wholesale merchants is in restraint of trade and prevents competition; that is, it prevents competition between the retail druggists.

It would appear to be undisputed and that there is no answer to the proposition that if A, the proprietor, sells to B and C, retail druggists, at one and the same price, on condition that B and C shall resell at a fixed price, there can be no competition in the sale of the medicines between B and C. It is in restraint of competition to that extent.

But the question arises, does it follow, necessarily, that whatever prevents competition as to price is unlawful?

If this contract that is forced upon the wholesale merchants by the proprietor, is a lawful contract, if they had a right to make it, then it cannot be held to be illegal competition or unlawful competition or to produce unlawful competition. As I intimated upon the argument, in my opinion the question in this case depends upon the validity of the contract in question. If that contract is lawful, there can be no restraint of trade. Has the manufacturer of a proprietary medicine (which is a trade secret) the right to fix the price at which his medicine shall be sold to the consumer, is the direct question involved. There is no contention that the price is an unreasonable one.

There is no question under the authorities but that the possessor of trade secrets, parties manufacturing under trade secrets and patentees, stand upon the same footing. They are both recognized by law as lawful monopolies.

If the law gives a patentee the sole and exclusive right to manufacture a certain article, it is necessarily a monopoly, and if it gives the proprietor of a trade secret preparation

or medicine the right to manufacture and sell it, and nobody else can do so, then that is also a monopoly.

The patent monopoly runs through the life of the patent, and the other monopoly runs through the life of the trade secret so long as it remains a trade secret unpublished to the world or undiscovered.

Now, this arrangement known as the direct contract plan first came before the court in England in the case of *Elliman v. Carrington* (1901) 2 Ch. 275, 84 L. T. Rep., N. S. 58, the opinion by Mr. Justice Kekewich. In that case (an excerpt from which I will read) he states the question very pointedly and very specifically.

"The defendant's point is that this written contract into which they have entered" (and it was, as I said a contract on the direct contract plan the same as the one before the court) "must be treated as waste paper in a court of law; that is to say, that no action can be brought upon it. That result follows, they say, from the fact or conclusion of the law, which they allege—namely, that the contract is in restraint of trade. In one sense no doubt that is perfectly true, because one of the contracting parties is not at liberty under the contract to do what he pleases with the goods which he purchases. But it is necessary to see what the contract really is. The plaintiffs are the manufacturers of Elliman's Royal Embrocation for horses and cattle, and Elliman's Universal Embrocation for human beings. They are not bound to sell the Embrocation at all; they are not bound to manufacture it. They are at liberty to do as they please, and when they have manufactured it, they are at liberty to sell it at whatever price they choose to fix; it may be a prohibitive one, or it may be such a small price that they cannot make any profit out of it. That is entirely for their consideration. There are no goods which the owner thereof may not lawfully retain or sell at such a price as he pleases. * * * Carrington & Son are minded to buy Elliman's Embrocation with a view to selling it again, that is to say, to buy wholesale in order to sell to others retail, and Elliman, Sons & Co. make a bargain with them that they shall not sell it below certain prices. That part of the bargain

has not been broken. And, that when they sell to others, they will procure from those others an agreement that they will not sell it below certain prices. That part of the bargain has been broken. Why should not Elliman, Sons & Co. be at liberty to fix the price in that way? Nobody has argued, and it could not possibly be argued, that they are not at liberty to fix the price on the first sale to Carrington & Son. Why should they not be at liberty to make the further bargain with Carrington & Son that they shall not sell it below a certain price? It is said that the contract is in restraint of trade. In one sense it is, but it is just as much and no more in restraint of trade for Elliman, Sons & Co., to say that they will not sell at all. It seems to me, to say the least, that what is restraint of trade as regards Carrington & Son is really the liberty of trade as regards Elliman, Sons & Co. The cases which have been cited are well known authorities expounding a great principle, and showing what exceptions there are to that principle. But this case seems to me not to fall within any principle or exception. I do not think it is touched by the authorities at all. It is merely a question of whether a man is entitled, when he is selling his own goods, to make a bargain as to the use to be made of them by the purchaser. It is said that the contract is against public policy, but that phrase merely embodies for the present purpose the great principle of restraint of trade, and to say that it is to prevent Elliman, Sons & Co. from exercising their own discretion, seems to me to be applying a well settled principle of law to facts to which it cannot have any possible application. If that principle is to be applied, to such a case, it must be applied elsewhere, but I cannot myself see that it has any application at all. On the question, therefore, as to the validity of the contract. I am entirely against the defendants."

In a case reported in the 67 Northeastern Reporter, page 136, the case of *Park & Sons Co. v. The National Wholesale Druggists' Association* (175 N. Y. 1), I find the following in the syllabus:

"The manufacturers of certain proprietary medicines and an Association of wholesale dealers therein entered into an

agreement to sell the goods at a uniform jobbing price for fixed quantities, only to such dealers as would conform to the manufacturers' price list in making sales of goods. All wholesale dealers had the right to purchase the goods from the manufacturers upon the same terms as members of the Association, on agreeing to maintain the prices established by the manufacturers. *Held* not to establish a monopoly on the part of the members of the Association.

"Where the manufacturers of patent medicines and an Association of wholesale dealers entered into an agreement by which the Association were to maintain the prices established by the manufacturers, the contract is not unlawful, as in restraint of trade, though it abolishes competition as to prices, where it places no restriction as to the quantities that the dealers may sell, or the territory in which they may transact business."

The decision I am reading from is that of the court of appeals of New York, April 28, 1903. The case further holds:

"The fact that manufacturers of patent medicine refuse to sell their goods to a wholesale dealer, except at retail prices, or to allow commissions on the goods purchased, does not show a boycott, where the refusal is grounded on the unwillingness of such wholesale dealer to maintain the selling prices established by the manufacturers.

"An injunction will not issue to prevent the members of the Wholesale Druggists' Association from watching the business place of a wholesale dealer to determine what druggist furnished him with proprietary articles in violation of their contract with the manufacturers.

"Equity will not restrain wholesale dealers in proprietary medicines from persuading manufacturers to establish uniform prices for fixed quantities of their goods, so as to enable small concerns to purchase as cheap as large ones, and compete with them in the retail trade.

"Where a druggist purchases the goods of the proprietor of a patent medicine under an agreement that he will maintain the price fixed by the manufacturer for sale to the con-

sumer, he is liable to respond in damages if he violates such contract.

"Where manufacturers of patent medicines have contracted with the wholesale dealers therein, to handle their goods at a uniform price, the fact that such wholesale dealers furnished the manfacturers with a list of dealers who were cutting the established price, does not show unlawful blacklisting."

Now, the contract in that case was substantially the contract here. The case is too long to read; it went up on demurrers, was very ably presented by different members of the court, and a very exhaustive discussion of the question was had. In other words, they sustained the contention that the manufacturer of proprietary medicine has the right to say to the wholesale dealer, I will sell you at a certain fixed price; you shall be appointed one of my agents, distributing agents, to sell these goods, on condition that you shall sell only to persons in good standing in the retail drug business, who will sell and agree to sell at the price fixed by the manufacturer of those goods; if I notify you that any person to whom you have sold has violated the agreement, by selling at cut rates, then you are no longer to sell to him, otherwise our contract will be annulled.

They hold that such an agreement in consonance with the decision of the court in the second chancery report ([1901] 2 Ch. 275) referred to is a valid and binding agreement and the reason for it is that manufacturers under trade secrets and patentees, by law, have a monopoly. There can be no competition in the manufacture of a particular article. The manufacturer who is manufacturing under a trade secret owns a property interest in that trade secret and he can dispose of his manufacture upon such terms as he desires. He can fix the rate at which his goods shall be sold, not only by the wholesale dealer, but by the retail dealer to the consumer.

It is well known that as to patented articles the patentee has a right to fix the price at which his article that he manufactures shall be sold to the consumer; it is done all over the country and it has been repeatedly recognized by the courts as good law that the manufacturer, under trade secrets, stands

exactly upon the same footing as the owner of a patented article.

Another strong case is in the 186 U. S., page 70, in a case against the National Harrow company (*Bement v. National Harrow Co.,* 186 U. S. 70). See also *Central Shade Roller Co. v. Cushman,* 143 Mass. 353, 9 N. E. 629, and *Standard Fireproofing Co. v. St. Louis Co.,* 177 Mo. 559, 76 S. W. 1008.

There are numerous other cases that were cited by counsel, one in regard to the Edison pronograph and talking machines [1] and a number of others where the same rule has been recognized, that the manufacturer of a patented article or of an article manufactured under a trade secret has the right to sell, fix the price under which the article that he sells shall be sold in the market to the consumer.

That being the case, why should the injunction issue? It appears to be admitted that in matters of general merchandise which are not patented, or not made under trade secrets, that the rule invoked by counsel that any kind of a combination, even to keep up prices, is in restraint of trade. That this rule does not apply to patentees or manufacturers under trade secrets, appears to be well established by the authorities.

In this case, the manufacturer of proprietary medicines under trade secrets, fixes the price. I cannot see, under the authorities, why it is in restraint of trade, nor why if it is in restraint of competition, the manufacturer has not a right for his own protection to say that his article shall not be sold below a certain price in the market. Experience appears to have demonstrated that unless he does so his business will be utterly demoralized. It is contended here, and there is some evidence tending to show, that this thing of cutting rates in the sale of proprietary medicine did demoralize the business. The wholesalers and the defendants here allege that as a result of that practice, a great many retail druggists who

---

[1] *Edison Phonograph Co. v. Pike* 116 Fed. 863; *Victor Talking Machine Co. v. The Fair,* 123 Fed. 424; *National Phonograph Co. v. Schlegel,* 128 Fed. 733; *Edison Phonograph Co. v. Kaufman,* 105 Fed. 960.—Ed.

ought to keep these medicines, refuse to keep them because they say there is nothing in it for them, they could not make anything by doing so, and that the cutting of rates had so demoralized the sale of those medicines that they would not handle them any longer. It is to the interest of the manufacturer that his medicines should be widely distributed, should be sold at every drug store, if possible, and in order to protect his own business, he is obliged to make a fixed rate and demand that all these parties should sell at those rates.

The decision—the only decision really, that touches the doctrine contended for by complainant and upon which they appear to have founded their case, is in the 137 Ind. (*Jackson v. Stanfield,* 137 Ind. 592, 36 N. E. 345, 37 N. E. 14, 23 L. R. A. 588), cited by counsel, in which there was an agreement between certain lumber dealers. It is not a parallel case by any means, although they do decide there that a penalty imposed for a violation of an agreement to sell only to certain parties, was illegal and in that case an injunction issued.

It was an action under their system of code pleading for damages which, having been ascertained, the court was asked to issue an injunction, and did issue an injunction. By a careful perusal of that case an attorney or judge would have no difficulty in distinguishing the difference between that and the present case.

The same question on the same kind of a contract came before the supreme court of Minnesota as was in the Indiana case and the holding was directly to the contrary (*Bohn Mfg. Co. v. Lumbermen's Ass'n,* 54 Minn. 223, 55 N. W. 1119, 21 L. R. A. 337, 40 Am. St. 319).

This decision in the supreme court of Indiana is opposed to our own court in its vital principles.

In a case that went up from myself, the Live Stock Exchange case, which was afterward affirmed by the supreme court (*People ex rel. v. Chicago Live Stock Exchange,* 143 Ill. 210), a bill was dismissed, which sought an injunction against the Live Stock Exchange. It had an association or union, by which they agreed that they would only sell to mem-

bers of the association and, members of the association agreed they would only buy stock from members of the association. The packers became members of the association. So there you had the main point, an agreement that they would only buy and sell between themselves. Outsiders went into the stock yards with cattle and they could not find any purchasers, they got one bid and they had to be satisfied with that. Nobody else would buy. An association in the west, in Kansas, I believe, attempted by bill filed here to break up this arrangement in the stock yards here on the ground that it was in restraint of trade. I could find no reason why any body of men could not get together and agree that they would only sell to each other and buy from each other, notwithstanding that was a market overt, a public market. The freedom of contract, it appeared to me, demanded that agreements of that kind should be sustained; that freedom of contract was as important as freedom of trade.

The complainant in that case (143 Ill. 210) not being a member of the association, it was held, had no standing in a court of equity to attack it, notwithstanding it prevented competition, as he alleged, in bidding for his cattle. That is the only decision in this state which in my opinion has any bearing upon the case at bar.

The regulation of trade and commerce is not a judicial function by any means; it is an administrative or legislative function, and in order to prevent a restraint of trade, our state and our nation have made laws, anti-trust laws, punishing parties who combine in restraint of trade or to create a monopoly. A party to a contract may bring that contract before the court, and if it involves a question as to whether it is in restraint of trade or not, the court must pass upon it; but when he is not a party to the contract, the proper remedy, it appears to me, is through the officers of the state or nation, by way of criminal or other prosecution, or even by bill filed on behalf of the public to restrain violations of the anti-trust law, or operations or combinations in restraint of trade. He has no standing, in my opinion, to call upon a court of equity to interpose in his favor. The remedies imposed by the legis-

lature for violations of the anti-trust laws ought to be pursued, and where the matter is not the construction or the enforcement of a contract between the parties who appear in the court, a court of equity ought not to take jurisdiction.

It may be that there are exceptions to that general rule, which I think is a proper one—there may be exceptional cases. This is not one.

The court, in granting an application for temporary injunction, must always look upon what may be called the balance of equity or of damages. If I grant a temporary injunction in this case, it is a mandatory injunction, it is practically a command on these wholesale merchants to sell to this party. Some of them allege different reasons why they will not sell to him, but the main reason is the contract in question, though there are other reasons which some of them allege and which are personal. He denies all allegations such as trying to corrupt their employes as intimated by the affidavits, trying to see the shipping books, etc.

I know of no way in which a court of equity can make one man trade with another. If a party puts himself in a position where he holds himself out to the public as ready to sell to everybody on the same terms, it may be that an action at law will lie against the merchant for any damages that a party may sustain to whom he refuses to sell, but I see no method of proceeding in equity by which I can make that merchant sell to that individual unless he wants to. He may refuse to trade with him from mere caprice. A court of equity cannot undertake to supervise the entire wholesale drug trade in this city, and see that they sell to this man Platt or to anybody else goods when they are demanded. I cannot undertake to inquire into each case, and see whether there is foundation for the refusal; whether it is based on personal reasons or is based upon this particular contract. It is such a matter and requires such supervision that a court of equity will not undertake it, but prefers to leave the party to his remedy at law. The great injury that would result to the trade generally, to the large number of people engaged in this business—not only retail druggists, but wholesale druggists and the

manufacturers, is so large, so vast, that the private injury
that this party may suffer by the failure to sell him goods,
ought not to overbalance that great amount of damage which
would be sustained by the issuing of an injunction.

An injunction of this kind is practically a decision of the
merits of the case in favor of the complainant on the affi-
davits and on a motion for temporary injunction. A court
with great reluctance issues a mandatory injunction in the
first instance. As a rule, it refuses until the final hearing
to issue any such injunction, in order that it may make no
mistake as to the merits of the case or as to the equities of
the parties.

The motion for injunction in this case will be denied.

### NOTE.

The decision of Judge Tuley in this case has been cited with ap-
proval and followed by Judge Kohlsaat in *Dr. Miles Medical Co. v.
Platt*, 142 Fed. 606 (U. S. C. C. Ill. Jan. 19, 1906), and by Judge
Cochran in *Hartman v. John D. Park & Sons Co.*, 145 Fed. 358, 386
(U. S. C. C. Ky. Feb. 14, 1906).

EXTENT OF THE RIGHT OF A MANUFACTURER TO CONTROL THE PRICE OF
HIS PRODUCTS.

A. *Proprietary medicine cases.*

(1) The legality of the contracts by which manufacturers of pro-
prietary medicines sell only to wholesale dealers under contracts
binding them to sell only at a certain price and only to retail deal-
ers who also agree only to sell at a certain price, or whose names
are not on a list published by the manufacturers as retail dealers
to whom the wholesalers shall not sell, has been upheld by the
courts of various states. *Garst v. Harris*, 177 Mass. 72, 58 N. E. 174;
*Garst v. Hall & Lyon Co.*, 179 Mass. 588, 61 N. E. 219, 55 L. R. A.
631; *Garst v. Charles*, 187 Mass. 144, 72 N. E. 839; *Park & Sons Co.
v. Nat. Wholesale Druggists' Ass'n*, 175 N. Y. 1, 67 N. E. 136, 62 L.
R. A. 632, 96 Am. St. Rep. 578; *Elliman v. Carrington* (1901) 2 Ch.
275, 84 L. T. (N. S.) 853; *Fowle v. Parks*, 131 U. S. 88; *Dr. Miles
Medical Co. v. Goldthwaite*, 133 Fed. 794; *In re Park*, 138 Fed. 421;
*Dr. Miles Medical Co. v. Platt*, 142 Fed. 606 (1906); *Hartman v.
Park*, 145 Fed. 358 (1906); *Wells & Richardson Co. v. Abraham*, 146
Fed. 190 (1906); *Hartman v. Hughes* (U. S. C. C. Minn., Judge Loch-
ren, July 14, 1905); *Platt v. Nat. Retail Druggists' Ass'n* (decision
of Judge Tuley, *supra*); *Dr. Miles Medical Co. v. May* (Ct. Com.
Pl. Allegheny Co., Pa., Judge McFarland, March, 1905). And these

contracts have been held not to be in restraint of trade. *Garst v. Harris*, 177 Mass. 72, 58 N. E. 174; *Park & Sons Co. v. Nat. Wholesale Druggists*, 175 N. Y. 1, 67 N. E. 136; *Hartman v. John D. Park & Sons Co.*, 145 Fed. 358.

In *Garst v. Harris*, 177 Mass. 72, 58 N. E. 174, there was an action on contract to recover liquidated damages for breach of an agreement not to sell Phenyo-Caffein below a stipulated price. At the time of the sale, and as part of it, a written agreement was read to the defendant and delivered to him, one condition of which provided that the acceptance of the goods with the notice of the conitions of the sale should be an assent to the terms. The defendant accepted the goods, expressed no dissent and sold the goods so purchased below the stipulated price. It was held that the defendant was bound by the terms of the contract not to sell below the stipulated price, and that he was liable for the amount of the liquidated damages.

In *Garst v. Charles*, 187 Mass. 144, 72 N. E. 839, the defendant procured a retail druggist to purchase Phenyo-Caffein from the plaintiff under contracts restricting the retail price. The druggist turned over the medicine to the defendant at the purchase price and he then sold the medicine at cut prices. An injunction was held proper to restrain defendant from selling at less than the specified price. In the course of the opinion in the case Judge Knowlton says: "The plaintiff being the owner and manufacturer of a proprietary medicine known as 'Phenyo-Caffein,' sold it to purchasers only under contracts in which they agreed not to sell it at retail at less than a specified price, and he undertook to stipulate that purchasers from his purchasers should obtain and sell it only under such an agreement. His right to secure such advantages to himself, so far as possible, by contracts in proper form, is not now questioned."

In *Garst v. Hall & Lyon Co.*, 179 Mass. 588, 61 N. E. 219, an injunction was sought to prevent a purchaser from selling Phenyo-Caffein at "cut" rates. The defendant purchased the medicine from one who was under a contract not to sell at less than a stipulated price. It was held that the injunction could not be granted to prevent a purchaser from one who did sell at the stipulated price selling the medicine at less than the stipulated rates, there being no privity of contract between the ultimate purchaser and the manufacturer.

In *John D. Park & Sons Co. v. Nat. Wholesale Druggists' Ass'n*, 175 N. Y. 1, 67 N. E. 136, 62 L. R. A. 632, 96 Am. St. 578 (1903), there was an action to recover damages for alleged injuries to plaintiff's business through a conspiracy on the part of the defendants. The court held that a plan by a voluntary association of dealers engaged in selling proprietary medicines, adopted by the manufactur-

ers of these medicines, in order to maintain stability of prices by which the manufacturers would sell at fixed prices, with a rebate only to concerns that maintained the selling price, is not void as creating a monopoly in restraint of trade or as against public policy, and that a merchant cannot complain if others, by representation and persuasion, induce the manufacturers to establish a uniform price for fixed quantities of goods.

In *Dr. Miles Medical Co. v. Platt*, 142 Fed. 606 (1906), upon exceptions to the answers to a bill for injunction, it was held that the system of selling medicines on the serial number plan and fixing the retail price of the same was valid, and that while the defendant might lawfully buy these medicines from retail druggists at the prices fixed between them and the manufacturers or general wholesale agents and sell them at will for such prices as he might make, still he could be enjoined from obtaining these medicines by inducing wholesalers or retailers to violate their contracts with the manufacturers.

In *Hartman v. Park*, 145 Fed. 358 (1906), an injunction was granted to restrain the defendant, a wholesale druggist, from obtaining "Peruna" by false representations from wholesalers and retailers who have contracted to sell Peruna only at a designated price, and from reselling it to retailers operating "cut rate drug stores," who in turn sell it to customers at less than the fixed retail prices, the serial numbers stamped on the labels and wrappers being removed so as to avoid detection. It was held that the manufacturer had the right to sell his medicine to the wholesaler and at the same time retain a control over the subsequent trade therein as to the retailers to whom and as to the prices at which the wholesalers may resell, and as to the prices at which the retailers may sell to the consumers.

In *Wells, Richardson & Co. v. Abraham*, 146 Fed. 190 (1906), it appeared that complainant was the manufacturer of "Paine's Celery Compound," which it sold under a trade-mark and in packages containing serial numbers thereon, and only to wholesale dealers under contracts binding them to sell only at a certain price, and only to retail dealers who also had contracts with complainant fixing the price at which the medicine should be sold to consumers. It was held that such contracts were legal and that complainant was entitled to an injunction restraining the defendants from inducing any purchaser who had made such a contract to violate the same by selling to defendants or from knowingly purchasing from any such person in violation of his contract, and from selling the medicine to consumers after the cartons and labels containing the directions for its use and the serial numbers by which the purchasers were traced had been removed.

In *Dr. Miles Medical Co. v. Goldthwaite*, 133 Fed. 794, the de-

fendant was restrained from interfering with such contracts, by inducing their violation by the parties thereto, and from selling the medicines of complainants in other than the original packages and at the contract price.

In *Elliman v. Carrington* (1901) 2 Ch. 275, contracts were held valid by which Carrington & Son, who sold at wholesale, bought from Elliman Sons & Co. "Elliman's Embrocation," agreeing that they would not sell it below certain prices, and that when they sold to others they would procure from those others an agreement not to sell below certain prices. The court held that the Ellimans had the right to fix the price not only at which they would sell to Carrington, but also the price at which Carrington should resell the same.

In *Dr. Miles Medical Co v. May Drug Store* (Court of Common Pleas, Allegheny Co., Pennsylvania, No. 610, March term, 1905), Judge MacFarland held that these contracts were valid and not in restraint of trade, but that a court of equity would not grant an injunction to complainant to restrain the defendant from inducing purchasers from the complainant to violate their contracts and sell the complainant's remedies to defendant, who then sold them to consumers at less than the retail price, on the ground that complainant did not come into a court of equity with "clean hands" on account of its misrepresentations as to the powers and remediable qualities of its preparations, "Dr. Miles' Nervine" and "Heart Cure."

(2) Where, however, a dealer purchases proprietary medicines from a retail dealer who has a right to sell to the consumer at the contract price, and such dealer subsequently resells the medicines thus purchased at less than the fixed retail price, it seems that the manufacturer cannot complain. The contracts contemplate sales by retailers which shall pass an absolute title to the property. *Garst v. Hall & Lyon Co.*, 179 Mass. 588, 61 N. E. 219, 55 L. R. A. 631; *Dr. Miles Medical Co. v. Platt*, 142 Fed. 606; *Wells, Richardson Co. v. Abraham*, 146 Fed. 190, 196. This rule has been held applicable to other forms of similar contracts:

(a) As to books. *Bobbs-Merrill Co. v. Straus*, 147 Fed. 15 (C. C. A., June, 1906), affirming 139 Fed. 155; *Scribner v. Straus*, 147 Fed. 28 (C. C. A., June, 1906), affirming 139 Fed. 193; *Harrison v. Maynard-Merrill Co.*, 61 Fed. 689, 10 C. C. A. 17; *Publishing Co. v. Smythe*, 27 Fed. 914. *Contra, Authors', etc. Ass'n v. O' Gorman Co.*, 147 Fed. 616.

(b) As to tobacco. In *Taddy & Co. v. Sterious & Co.* (1904) 1 Ch. 354, 20 T. L. R. 102, 89 L. T. R. 628, tobacco was sold in boxes, and the following notice was printed on the box: "All of the above packet tobacco and cigarettes are sold by Taddy & Co. upon the express condition that retail dealers do not sell the packet tobacco or cigarettes below the prices set forth. Acceptance of the goods will be deemed

a contract between the purchaser and Taddy & Co. that he will observe these stipulations." The court there said that "conditions of this kind did not run with the goods and could not be imposed upon them. Subsequent purchasers, therefore, did not take the goods subject to any conditions which the court could enforce."

(c) As to watches. *Ingersoll v. Snellenberg*, 147 Fed. 522 (October, 1906).

(3) *Restraint of trade.* (a) These proprietary medicine contracts by which the retail price is sought to be controlled have in several cases been held not to be in restraint of trade. *Park & Sons Co. v. Nat. Wholesale Druggists*, 175 N. Y. 1, 67 N. E. 136; *Garst v. Harris*, 177 Mass. 72, 58 N. E. 174; *Hartman v. Park & Sons Co.*, 145 Fed. 358; *Elliman v. Carrington* (1901) 2 Ch. 275; *Dr. Miles Medical Co. v. May Drug Co.* (Allegheny Co., Pa., Com. Pl.) *supra; Platt v. Retail Druggists' Ass'n*, 1 Ill. C. C. 1.

(b) But actions for damages have been sustained under the Sherman Act of 1890, arising out of this system of contracts.

In *Loder v. Jayne*, 142 Fed. 1010, where it appeared that three voluntary associations, composed of the manufacturers, wholesalers and retailers, respectively, of drugs, proprietary medicines, etc., were organized to arbitrarily fix a minimum retail price for such articles, and then restricted the sale of such articles to such retailers only as conducted their retail business in accordance with the arbitrary standard of prices, it was held that such combination was in restraint of interstate commerce in the drug trade so far as it excluded "aggressive cutters" of prices and those who dealt with them, and was in violation of the Act of Congress, July 2, 1890, prohibiting monopolies in restraint of interstate trade and commerce, and treble damages to the amount of $32,641.50 were recovered by the plaintiff.

In *Klingel's Pharmacy v. Sharp & Dohme*, 64 Atl. 1029 (Md., Nov. 2, 1906), it was held that where an association of retail druggists in a certain city and wholesale druggists formed a combination to maintain a maximum schedule of prices, and in pursuance of a plan refused to sell to plaintiff, a retailer, who had refused to join the combination, and coerced and intimidated vendors of like commodities by means of threats to blacklist and boycott such vendors if they sold to plaintiff, whereby such vendors were deterred from selling to plaintiff, the parties to the combination were liable to plaintiff for resulting damages to his business.

B. *Patents.*

The principle is now well recognized that a patentee or his assignee has the right to impose restrictions upon the future sale or use of a patented article, and may fix the price at which the patented article or product shall be marketed. *Bement v. Nat. Harrow Co.,*

186 U. S. 70, 92; *Heaton-Peninsular Button Co. v. Eureka Specialty Co.*, 77 Fed. 288, 25 C. C. A. 267, 35 L. R. A. 728; *Indiana Mfg. Co. v. Case Threshing Machine Co.*, 148 Fed. 21; *Ingersoll v. Snellenberg*, 147 Fed. 522; *Nat. Phonograph Co. v. Schlegel*, 128 Fed. 733; *Victor Talking Machine Co. v. The Fair*, 123 Fed. 424; *Edison Phonograph Co. v. Pike*, 116 Fed. 863; *Edison Phonograph Co. v. Kaufman*, 105 Fed. 960; *Consolidated Seeded Raisin Co. v. Griffin*, 126 Fed. 364; *Cortelyou v. Lowe*, 111 Fed. 1005, 49 C. C. A. 671; *Dickerson v. Tinling*, 84 Fed. 192, 28 C. C. A. 139; *Dickerson v. Matheson*, 57 Fed. 524; *Bonsack Machine Co. v. Smith*, 70 Fed. 383; *Cortelyou v. Johnson*, 138 Fed. 110; *Bowling v. Taylor*, 40 Fed. 404; *Hulse v. Machine Co.*, 65 Fed. 864; *Central Shade Roller Co. v. Cushman*, 143 Mass. 353, 9 N. E. 629; *Gloucester Isinglass & Glue Co. v. Russia Cement Co*, 154 Mass. 92, 27 N. E. 1005; *Standard Fireproofing Co. v. St. Louis Co.*, 177 Mo. 559, 76 S. W. 1008: *Morse Twist Drill Machine Co. v. Morse*, 103 Mass. 73; *Bancroft v. Union Co.*, 57 Atl. 97 (N. H. 1903).

C. *Copyright cases.* .

In several cases the right of the owner of copyrighted publications to control the future trade and price therein has been before the courts. *Bobbs-Merrill Co. v. Straus*, 147 Fed. 15, affirming 139 Fed. 155; *Scribner v. Straus*, 147 Fed. 28, affirming 139 Fed. 193; *Mines v. Scribner*, 147 Fed. 927; *Authors & Newspapers' Ass'n v. O'Gorman Co.*, 147 Fed. 616; *Straus v. Am. Pub. Ass'n*, 177 N. Y. 473, 69 N. E. 1107; *Doan v. American Book Co.*, 105 Fed. 772, 45 C. C. A. 42; *Heath v. American Book Co.*, 97 Fed. 533; *Harrison v. Maynard, Merrill & Co.*, 61 Fed. 689, 10 C. C. A. 17; *Publishing Co. v. Smythe*, 27 Fed. 914; *Murphy v. Christian Press Ass'n Pub. Co.*, 38 App. Div. 426, 56 N. Y. Supp. 597.

D. *Miscellaneous general cases.*

In other cases contracts have been presented by which in various forms the manufacturers sought to control the trade and retail prices of their products. *Walsh v. Dwight*, 40 App. Div. 513, 58 N. Y. Supp. 91 (Dwight's Cow Brand Saleratus and Soda); *Commonwealth v. Grinstead*, 23 Ky. L. Rep. 590, 63 S. W. 427 (groceries); *Wieboldt v. Standard Fashion Co.*, 80 Ill. App. 67 (patterns); *Whitwell v. Continental Tobacco Co.*, 125 Fed. 454 (tobacco); *Re Greene*, 52 Fed. 104 (whiskey); *Olmstead v. Distilling & Cattle Feeding Co.*, 77 Fed. 265; *Pasteur Vaccine Co. v. Burkey* (Tex.) 54 S. W. 804.